No. _____

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; CHERYL ROGERS; GREG ROGERS; E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; M.G., by and through her mother, Amber Galea; and W.M., by and through his mother, Kersey Clark,

*Plaintiffs*,

v.

GREENVILLE COUNTY, SOUTH CAROLINA; GREENVILLE COUNTY LIBRARY SYSTEM; BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System, and KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,

*Defendants.*

On Appeal from the United States District Court
for the District of South Carolina
Case No. 6:25-cv-02599-DCC

## LIBRARY DEFENDANTS' UNOPPOSED PETITION FOR PERMISSION TO APPEAL UNDER 28 U.S.C. § 1292(b)

WILSON JONES CARTER & BAXLEY, P.A.
Charles F. Turner, Jr.
John P. "Jack" Riordan
J. Nathan Ozmint
325 Rocky Slope Rd. / Suite 201
Greenville, SC 29607
(864) 672-3711

NELSON MULLINS RILEY & SCARBOROUGH LLP
Miles E. Coleman
2 West Washington Street / Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

*Counsel for Defendants-Petitioners Greenville County Library System, Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____    Caption: O.R. et al. v. Greenville County, South Carolina et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Greenville County Library System
(name of party/amicus)

_____

who is ____Defendant–Petitioner____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Miles E. Coleman          Date: _____ June 8, 2026 _____

Counsel for: Defendants–Petitioners

- 2 -          Print to PDF for Filing

ii

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____     Caption: O.R. et al. v. Greenville County, South Carolina et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Beverly James, in her official capacity as Executive Director of the Greenville County Library System
(name of party/amicus)

_____

who is _____Defendant–Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Miles E. Coleman      Date: June 8, 2026

Counsel for: Defendants–Petitioners

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _____     Caption: O.R. et al. v. Greenville County, South Carolina et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System
(name of party/amicus)

_____

who is _____Defendant–Petitioner_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?                            ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
    other publicly held entity?                                               ☐YES ☑NO
    If yes, identify all such owners:

v

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Miles E. Coleman          Date: _____ June 8, 2026 _____

Counsel for: Defendants–Petitioners

Print to PDF for Filing

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS ................................................................................ i

TABLE OF AUTHORITIES ............................................................................... viii

INTRODUCTION .............................................................................................. 1

BACKGROUND ............................................................................................... 2

    A.    Factual background ........................................................................ 2

    B.    Proceedings below ......................................................................... 5

QUESTIONS PRESENTED .................................................................................. 8

RELIEF SOUGHT ............................................................................................. 9

REASONS THE PETITION SHOULD BE GRANTED ............................................... 9

    I.    The district court's order satisfies the requirements for interlocutory appeal under Section 1292(b). ................................................................ 9

        A.    The order raises controlling questions of law. .............................. 10

        B.    There is substantial ground for differences of opinion as to the questions of law. .......................................................................... 12

            1.    Courts are divided whether there is a constitutional right to receive information from the government. ...................... 13

            2.    Courts are divided whether the curation of public library collections is government speech. ........................................ 14

        C.    Immediate appeal of the order is likely to advance the ultimate termination of the litigation. ....................................................... 16

    II.    This case and this stage of the proceeding present a suitable vehicle for consideration and resolution of the questions presented. ................... 18

CONCLUSION ................................................................................................ 22

**Page(s)**

**Cases**

*ACLU of NC v. Tennyson*,
815 F.3d 183 (4th Cir. 2016) ...................................................................15

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026) ..............................................................17, 18

*Arjay Assocs., Inc. v. Bush*,
891 F.2d 894 (Fed. Cir. 1989) ................................................................19

*Blade v. U.S. Bankruptcy Court*,
22 Fed. App'x 487 (6th Cir. 2001) ..........................................................19

*Board of Education, Island Trees Union Free School District No. 26
v. Pico*, 457 U.S. 853 (1982)................................................6, 7, 12, 13

*Bryant v. Gates*,
532 F.3d 888 (D.C. Cir. 2008) (Kavanaugh, J., concurring)............................14

*Chiras v. Miller*,
432 F.3d 606 (5th Cir. 2005) ..................................................................15

*City of Charleston, S.C. v. Hotels.com, LP*,
586 F. Supp. 2d 538 (D.S.C. 2008) ..........................................................10

*Coal. For Equity & Excellence In Maryland Higher Educ. v.
Maryland Higher Educ. Comm'n*,
No. CIV. CCB-06-2773, 2015 WL 4040425 (D. Md. June 29,
2015) .........................................................................................10, 12

*Couch v. Telescope Inc.*,
611 F.3d 629 (9th Cir. 2010) ..................................................................12

*E.K. et al. v. Dept. of Defense Ed. Activity et al.*,
No. 25-2497 (4th Cir.) ..........................................................................21

*Fannin v. CSX Transp., Inc.*,
873 F.2d 1438, 1989 WL 42583 (4th Cir. 1989)..........................................16

*Fleck & Assocs., Inc. v. Phoenix*,
 471 F.3d 1100 (9th Cir. 2006) ...................................................................19

*Gilmore v. Jones*,
 No. 3:18-CV-00017, 2019 WL 4417490 (W.D. Va. Sept. 16, 2019).................10

*Humaid v. Garland*,
 714 F. Supp. 3d 201 (W.D.N.Y. 2024).........................................................19

*Int'l Refugee Assistance Project v. Trump*,
 404 F. Supp. 3d 946 (D. Md. 2019)..........................................................12, 16

*Johnson v. Jones*,
 515 U.S. 304 (1995)....................................................................................9

*Kennedy v. St. Joseph's Ministries, Inc.*,
 657 F.3d 189 (4th Cir. 2011) .....................................................................11

*Little v. Llano County*,
 138 F.4th 834 (5th Cir. 2025) (en banc), cert. denied 146 S. Ct. 886
 (2025)...................................................................................................13, 15

*Lynn v. Monarch Recovery Mgmt., Inc.*,
 953 F. Supp. 2d 612 (D. Md. 2013).............................................................17

*McConnell v. FEC*,
 540 U.S. 93 (2003)....................................................................................18

*Moody v. NetChoice, LLC*,
 603 U.S. 707 (2024)...................................................................................16

*Muir v. Ala. Educ. Television Comm'n*,
 688 F.2d 1033 (5th Cir. 1982) (en banc) .....................................................13

*Nat'l Veterans Legal Servs. Program v. United States*,
 321 F. Supp. 3d 150 (D.D.C. 2018).............................................................12

*Penguin Random House, LLC v. Robbins*,
 172 F.4th 581 (8th Cir. 2026) ..............................................................13, 15

*People for the Ethical Treatment of Animals v. Gittens*,
 414 F.3d 23 (D.C. Cir. 2005)......................................................................14

*Pickens Cnty. Branch of the NAACP et al v. Sch. Dist. of Pickens
 Cnty.*, No. 8:26-cv-00144-JDA (D.S.C.) .....................................................20

*S.C. Ass'n of Sch. Librarians v. Weaver et al.*,
No. 3:25-cv-12857-SAL (D.S.C.)......................................................20

*SC State Conference of the NAACP et al. v. Weaver et al.*,
No. 25-2216 (4th Cir.) ...........................................................20, 21

*Straw v. United States*,
2023 WL 4828034 (N.D. Cal. July 26, 2023) ....................................19

*United States ex rel. Michaels v. Agape Senior Cmty., Inc.*,
848 F.3d 330 (4th Cir. 2017) ........................................................10

*United States v. Am. Libr. Ass'n, Inc.*,
539 U.S. 194 (2003)...................................................................14

*United States v. Skrmetti*,
605 U.S. 495 (2025)...................................................................18

*Vista Graphics v. Va. DOT*,
682 F. App'x 231 (4th Cir. 2017) ...................................................15

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) ..................................................13, 15

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996)....................................................................9

*Zinski v. Liberty Univ.*,
No. 25-1228 (4th Cir.) .................................................................11

**Statutes**

28 U.S.C. § 1292(b) ......................................................1, 9, 10, 11, 21

S.C. Code Ann. § 4-9-36(3) .................................................................2

**Other Authorities**

16 Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 3930.......................10, 12

Fed. R. App. P. 5 ............................................................................1

Fed R. Civ. P. 12(b)(1).....................................................................19

Spencer Donovan, *Pickens library board pauses sweeping book review*, POST & COURIER (March 10, 2026) .....................................20

The Greenville County Library System, Beverly James, and Karen Allen (collectively, the "Library Defendants") petition this Court pursuant to 28 U.S.C. § 1292(b) and Federal Rule of Appellate Procedure 5 for permission to appeal from the district court's order of March 19, 2026, granting in part and denying in part the Library Defendants' motion to dismiss.

## INTRODUCTION

This case raises dispositive legal questions that are increasingly arising and dividing courts in this Circuit and across the nation. One such question is whether the First Amendment provides an affirmative constitutional right whereby a member of the public can compel the government to provide (or keep providing) him with information of his choosing at taxpayer expense. Another is whether the selection, curation, and management of public library materials is government speech that's not subject to the Free Speech Clause. As the district court certified below, and as plaintiffs agree by stating they do not oppose the interlocutory review of these questions, each of the Section 1292(b) factors are met here.

The appeal raises questions of law that are novel in this Circuit and that have divided courts and jurists in other jurisdictions. The Court need not address any facts of the dispute and is free to base its conclusion entirely on questions of law. Answering the threshold questions identified above would materially advance the litigation—if not end it entirely. In addition, the salutary effects of this Court's

1

guidance would extend beyond this case. In South Carolina alone, at least four other pending federal lawsuits involve constitutional challenges to public library or public-school library curation, with another one waiting in the wings. And that's just in one state. Similar cases are or soon will be percolating in the other states of this Circuit.

This case—the first to reach this Court involving a public library—offers the Court an opportunity to establish the law, provide guidance to the lower courts, library boards, and the public across the Circuit, and spare lower courts and litigants the time, effort, and expense of litigating and deciding cases that may turn out to lack any basis in the law. The Court should grant the petition and set a schedule for briefing on the merits of the district court's order.

## BACKGROUND

### A. Factual background

The Greenville Library System is a public library system established by Greenville County, the most populous county in South Carolina. (ECF 5 at ¶¶ 13, 24.) The library system is controlled and managed by a county-appointed board currently consisting of eleven members (the "Board"). (*Id.* at ¶¶ 15–16.) As part of its management of the library system, the Board is empowered by law to

- "Acquire books and other library materials and provide for use throughout the county," S.C. Code Ann. § 4-9-36(3);
- "Take any actions deemed necessary and proper by the board to establish, equip, operate, and maintain an effective library system within the limits of approved appropriations of county council," *id.* § 4-9-36(9);

2

- "Provide and make available to residents of the county books and library materials," *id*. § 4-9-37(a); and

- "Adopt regulations necessary to insure effective operation, maintenance and security of the property of the library system," *id*. § 4-9-37(b).

The Board is also responsible for establishing and applying its Collection and Development Maintenance Policy (the "Collection Policy"), which is intended to assist library staff and inform the public of its collection decisions. (ECF 5 at ¶¶ 18, 27.) The Board regularly updates and maintains this policy, with the most recent amendment taking effect in February 2025. Under this policy, the library system undertakes an ongoing process of evaluating materials to determine if they should be added, removed, or retained in the library's collection. Such decisions are made following different criteria outlined in the policy and are ultimately left to the Board's discretion.

In 2024, the Board amended the Collection Policy in two ways that form the basis for this lawsuit. *First*, the Board added the following provision to the section of the Policy relevant to the Juvenile Collection, which is intended for infants through 12-year-olds:

> The Library recognizes parents/legal guardians are the primary source of education for their children, and that they have a fundamental right and responsibility to direct the upbringing and education of children under their care including issues of moral, social, physical, civic, and spiritual development.
>
> To that end, materials targeting audiences aged 0-12 in which the illustrations, themes, or story lines affirm, portray, or discuss changing

the appearance of a minor's gender in ways inconsistent with the minor's biological sex, will be located in the Parenting and Early Childhood (PEC) collection, including:

- Social transitioning: Pronouns or dress inconsistent with biological sex for the purpose of affirming gender transitioning.

- Medical or surgical procedures: Puberty blocking drugs, cross-sex hormones, or surgical procedures for the purpose of affirming gender transitioning.

- Gender fluidity: The possibility of changing genders at will or being no gender at all for the purpose of affirming gender transitioning.

(*See* ECF 5 at ¶ 74; *see also* ECF 5-1 at 8.)

*Second*, the Board added a provision to the Collection Policy relevant to the

Young Adult section, which is intended for teens aged 13 through 18:

The Library System recognizes that parents/legal guardians have a fundamental right to be involved in all aspects of their minor children's lives, especially in matters as life changing as gender identification.

Therefore, materials targeting audiences aged 13–17 with characters who have transitioned or are in the process of transitioning from a gender that corresponds to their biological sex to a different gender will be located in the Adult Collection.

This includes materials with illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning, whether changes are social (names, pronouns) or physical.

(ECF 5 at ¶ 79; *see also* ECF 5-1 at 13.)

Each of the 13 Greenville Library locations contains a Parenting and Early

Childhood section. (*See* ECF 46 at ¶ 5.) No books have been removed from or

transferred between any Greenville Library locations because of the Board's

revisions to the Collections Policy. (*Id*. at ¶ 7.) At all relevant times—before the policy changes, after them, and still today—the library's collection has included hundreds of books categorized under the computer searchable subjects "LGBTQ" (628 books), "transgender" (261 books), "LGBTQIA" (268 books), "gender identity" (185 books), "gender identity—juvenile fiction" (24 books), "gender identity—juvenile literature" (13 books), and "gender identity—comic books, strips, etc." (14 books). (*Id*. at ¶ 9.)

**B.      Proceedings below**

Plaintiffs sued on March 26, 2025, and shortly thereafter filed an Amended Complaint that asserted four causes of action, each premised on the asserted constitutional right to receive or access information from the government. (*See* ECF 5 at ¶¶ 166, 171, 175, 177, 180; *see also id*. at ¶¶ 7–8, 36, 129–31, 143, 149, 156, 163.) The main thrust of Plaintiffs' allegations was that the two provisions of the Collection Policy about gender transitioning violate their First Amendment and Equal Protection Rights by "imped[ing] library patrons' access to such materials." (*Id*. at 10 and ¶¶ 36–96.) Additionally, they alleged that the Library "enforces a widespread custom and practice of discriminating against the collection, retention, and display of LGBTQ library materials, including with respect to books for adults." (*Id*. at 21; *see also id*. at ¶¶ 97–115).

The Library Defendants moved to dismiss, arguing in part that the so-called right to receive information does not obligate the government itself to provide (or keep providing) information that a plaintiff desires, and the selection, curation, and placement of library materials is government speech that is not subject to the Free Speech Clause. (*See* ECF 20 at 15–25.) The motion was fully briefed, and the district court heard arguments on January 29, 2026.

The district court granted in part and denied in part the Library Defendants' motion to dismiss. (*See* ECF 44.) The court concluded that Plaintiffs had standing to assert their First Amendment challenge to the written Collections Policy (*id*. at 10–11) but lacked standing to assert their First Amendment challenge to the library's alleged unwritten policy and practice (*id*. at 13–15). The court further concluded that although the library treats every similarly situated plaintiff identically, Plaintiffs nevertheless had standing to bring their Equal Protection claims both against the written and alleged unwritten policies. (*Id*. at 15–18.)

Turning to the viability of Plaintiffs' claims, the district court was unpersuaded by the Library Defendants' argument that a majority of the justices in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982) concluded that there is no constitutional right for public-school students to receive information from the government, and, therefore, there is no constitutional right for a library patron to receive information from the government either. (*Id*. at

26.) Instead, the district court ruled that the plurality in *Pico* adopted a rule that the First Amendment limits the discretion of public libraries to place content-based restrictions on access to materials in their collections, and that Plaintiffs had plausibly alleged a violation of this rule. (*Id*. at 27–28.)

Having concluded that Plaintiffs stated a plausible claim for violation of their right to receive information, the district court turned to the Library Defendants' alternative argument for dismissal, namely, that the curation of public library collections is government speech that's not subject to the Free Speech Clause. The district court acknowledged that other circuits and out-of-circuit district courts have disagreed with one another whether library curation constitutes government speech and concluded that this Court's government speech precedent in other contexts did not control the outcome here because this case arose in a "distinguishable factual background." (*Id*. at 20–22.) Accordingly, the district court denied the Library Defendants' motion to dismiss the case under the government speech doctrine. (*Id*. at 22.) The court likewise rejected the Library Defendants arguments that the equal protection claims—claims that expressly rest on the Board's alleged infringement of Plaintiffs' asserted right to receive or access information—were merely repackaged versions of the First Amendment claims that should be dismissed for lack of a cognizable right. (*Id*. at 30–34.)

The Library Defendants subsequently moved to certify the order for interlocutory appeal or, alternatively, to reconsider the ruling or to stay further proceedings. (*See* ECF 47.) Plaintiffs did not oppose certification. (*Id*. at 2 n.2.) On May 28, 2026, the district court certified its order. (ECF 50.) This petition followed. Plaintiffs do not oppose the request to accept the appeal of the questions presented.[1]

<u>**QUESTIONS PRESENTED**</u>

The district court certified two "questions of law that are novel to this Circuit, including whether individuals have a positive right to receive information from a public library under the First Amendment and whether a public library's collection decisions are government speech." (ECF 50 at 7; *see also id*. at 10 ("[The] Order should be certified for immediate, interlocutory appeal on the issues described herein and set out in the Library Defendants' Motion.").[2]) The Library Defendants request

---

[1] Co-defendant Greenville County, South Carolina is not a party to this petition but does not oppose it. There are no separate claims against Greenville County, and the effect of any rulings in this appeal would advance the ultimate termination of the litigation on all claims and all parties.

[2] The Library Defendants' motion for certification framed the issues as:

    (a) Whether public library patrons have a constitutional right to receive information that prevents a public library from removing books or limiting minors' access to them based on the books' contents or viewpoints.

    (b) Whether a public library's collection decisions, including the addition, removal, or relocation of books within the collection, is government speech that is not subject to or constrained by the Free Speech Clause.

(ECF 47 at 1.)

that the order be accepted for review by this Court under Section 1292(b). *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) ("As the text of §1292(b) indicates, appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court.") (emphasis in original).

## RELIEF SOUGHT

The Library Defendants seek reversal of the district court's denial of their motion to dismiss. Each of Plaintiffs' claims rests on a non-cognizable right, namely the supposed right to access or receive information from the government. Alternatively, Plaintiffs' First Amendment claims are barred because public libraries' selection and curation decisions are government speech.

## REASONS THE PETITION SHOULD BE GRANTED

**I.  The district court's order satisfies the requirements for interlocutory appeal under Section 1292(b).**

An interlocutory appeal is appropriate here. Interlocutory appeals serve an important purposes to "simplify, or more appropriately direct, the future course of litigation[,] . . . thereby reduc[ing] the burdens of future proceedings, [and] perhaps freeing a party from those burdens entirely." *Johnson v. Jones*, 515 U.S. 304, 309–10 (1995). Interlocutory appeal is appropriate when (1) the order raises a controlling question of law, (2) there is substantial ground for difference of opinion as to that question, and (3) an immediate appeal may materially advance the ultimate

9

termination of the litigation. *See* 28 U.S.C. § 1292(b). All three conditions are easily satisfied here.

## A. The order raises controlling questions of law.

Certification of immediate appeal is appropriate for "an order presenting a 'pure question of law'" that does not require "delv[ing] beyond the surface of the record in order to determine the facts." *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340–41 (4th Cir. 2017). "A question of law is generally considered to be controlling within the meaning of § 1292(b) if the action would have been terminated had the district court ruled the opposite way." *City of Charleston, S.C. v. Hotels.com, LP*, 586 F. Supp. 2d 538, 542 (D.S.C. 2008). Courts have also recognized that a question is controlling if it "substantially shorten[s] the litigation." *Gilmore v. Jones*, No. 3:18-CV-00017, 2019 WL 4417490, at \*3 (W.D. Va. Sept. 16, 2019); *see also Coal. For Equity & Excellence In Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, No. CIV. CCB-06-2773, 2015 WL 4040425, at \*4 (D. Md. June 29, 2015) (acknowledging that "a question also may be controlling 'if interlocutory reversal might save time for the district court, and time and expense for the litigants'" (quoting 16 Wright et al., Federal Practice & Procedure § 3930)).

Plaintiffs' claims are premised on a central question that is novel to this Circuit: do individuals have an affirmative right to receive information from a public

library? If not, Plaintiffs' claims—all of which rest on an alleged impingement on their receipt of or access to information—necessarily fail. Even if there were such a right, Plaintiffs' claims implicate another potentially dispositive legal question that hasn't previously been decided by this Court: whether a public library's collection decisions are government speech (as some courts have held) or are constrained by Free Speech principles from other contexts (as other courts have held). It's difficult to imagine questions of law more appropriate for interlocutory review than those.

Answering the threshold questions identified above would materially advance the litigation—if not end it entirely. The Court would not need to address any facts of the dispute and is free to base its conclusion entirely on questions of law. The Court has previously certified similar legal issues as controlling for purposes of Section 1292(b). *See*, *e.g.*, *Kennedy v. St. Joseph's Ministries, Inc.*, <u>657 F.3d 189, 195</u> (4th Cir. 2011) (noting in a case with "First Amendment implications" that "the requirements of § 1292(b) are clearly satisfied in this case" because "[w]e are faced with a pure question of law and our resolution of it terminates the case"); *see also Zinski v. Liberty Univ.*, No. 25-1228 (4th Cir.) (a recently-argued case in which the Court accepted interlocutory review under section 1292(b) of an unsettled First Amendment threshold question). Similarly, the district court's order here raises controlling questions of law that are proper for interlocutory appeal.

**B.** **There is substantial ground for differences of opinion as to the questions of law.**

There is substantial ground for difference of opinion when "controlling law is unclear." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 950 (D. Md. 2019) (citing *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010)). Courts generally find there is substantial ground for disagreement when circuits disagree on the issue of law, the relevant court of appeals has not spoken on the issue, or the issue is novel and without significant legal guidance. *See id.*; *see also Nat'l Veterans Legal Servs. Program v. United States*, 321 F. Supp. 3d 150, 155 (D.D.C. 2018).

Plaintiffs' novel theories are untested in this Circuit, and constitutional jurisprudence in the library context has long been disputed—as shown by the fractured decisions in *Pico*. Across the country, courts are trying to answer similar questions. When faced with legal issues of particular significance, courts are more likely to determine that there is substantial ground for disagreement. *See*, *e.g.*, *Coal. For Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n*, No. CIV. CCB-06-2773, 2015 WL 4040425, at *6 (D. Md. June 29, 2015) (citing 16 Wright et al., Federal Practice & Procedure § 3930).

The legal questions presented in this litigation are novel, nationally important, and unsettled. The Court should accept the interlocutory appeal.

**1. Courts are divided whether there is a constitutional right to receive information from the government.**

To the extent courts have addressed the right-to-receive-information issue in the library context, the results so far are mixed. Start with the severely fractured ruling in *Pico*. As noted by the district court here, the plurality and a concurrence in *Pico* contemplated such a right or implied it may exist. But five of the Justices opined that the right doesn't exist. *See Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (5th Cir. 1982) (en banc) (noting that a "majority" of *Pico*'s Justices agreed "there is no First Amendment obligation upon the State to provide continuing access to particular books").

Other courts, including one considering a case strikingly similar to this one, have struggled with the question and concluded that this alleged affirmative right doesn't exist. *See Little v. Llano County*, 138 F.4th 834, 850–51 (5th Cir. 2025) (en banc) (holding in a 10-7 en banc vote in a case quite similar to this one that there is no affirmative right to receive information from a public library that had removed or relocated library books), cert. denied 146 S. Ct. 886 (2025); *see also Penguin Random House, LLC v. Robbins*, 172 F.4th 581, 586 (8th Cir. 2026) (noting that "the removal of a book from a school library does not prevent a student from 'receiving' the information" and that "[t]he First Amendment does not guarantee students the right to access books of their choosing at taxpayer expense"); *Walls v. Sanders*, 144 F.4th 995, 1000 (8th Cir. 2025) ("Though a listener's right to receive information

means the government cannot stop a willing private speaker from disseminating his message, that right cannot be used to require the government to provide a message it no longer is willing to say….[C]itizens cannot require the government to express a certain viewpoint or maintain a prior message.").

The district court correctly noted there are substantial grounds for differences of opinion on the questions presented here. This Court should grant the petition, review the order, and correct its ruling.

### 2. Courts are divided whether the curation of public library collections is government speech.

There are also grounds for differing opinions on the applicability of the government speech doctrine in this context. Several cases and jurists have indicated that a public library's selection and curation of its collection is government speech that isn't subject to the Free Speech Clause. *See Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities *such as libraries*[.]") (emphasis added); *People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *see also United States v. Am. Libr. Ass'n, Inc.*, 539 U.S. 194, 205 (2003) (plurality) ("Public library staffs necessarily consider content in

14

making collection decisions and enjoy broad discretion in making them.");[3] *but see Little*, 138 F.4th at 851–66 (plurality) (garnering only seven votes in support of the conclusion that public library curation is government speech).

Likewise, although this Court has not previously confronted the question in the context of public library collections, it has concluded in other contexts that the government's curation of private speakers' messages is government speech that's not subject to the Free Speech Clause. *See*, *e.g.*, *Vista Graphics v. Va. DOT*, 682 F. App'x 231, 235 (4th Cir. 2017) (holding the state's selection of a privately-printed tourist guide to display at rest stops was government speech, and state was not required to promote every potential point of view); *ACLU of NC v. Tennyson*, 815 F.3d 183, 185 (4th Cir. 2016) (concluding that a state license plate program was government speech, so North Carolina was "free to reject license plate designs that

---

[3] So too, in the public-school context, some courts have held that selection of curricula is government speech. *See*, *e.g.*, *Walls*, 144 F.4th at 1004 (holding a school's selection of third-party speech for its curricula is government speech not subject to the Free Speech Clause and noting there are "numerous Supreme Court decisions holding that the government is permitted to engage in viewpoint discrimination when it speaks"); *Chiras v. Miller*, 432 F.3d 606, 618–20 (5th Cir. 2005) ("[T]he selection of curricular materials by the [State] Board [of Education] is clearly government speech" and "students have no constitutional right to compel the Board" to allow use of certain textbooks); *but see Robbins*, 172 F.4th at 587 (declining to extend the government speech doctrine to public-school library curation because an easier path led to the same destination, namely the court's conclusion that school library collections are "properly characterized as part of the school's curriculum" over which students and authors lacked any cognizable First Amendment right).

convey messages with which it disagrees"); *accord Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024) ("Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own.").

There are substantial bases for differing opinions on the issue. This Court should review and resolve the issue.

### C. Immediate appeal of the order is likely to advance the ultimate termination of the litigation.

Because Plaintiffs assert a novel theory of law with their alleged positive right to receive information from a public library, the suit seems likely to result in lengthy, expensive, and resource-intensive litigation. Significant judicial resources will be expended to resolve the nature, scope, and existence of that right. It is very possible that the parties will invest years into this case, only for an appellate court to determine that there was never any cognizable right in the first place.

Immediate appeal of the order will materially advance the ultimate termination of the litigation because it can deter "protracted and expensive litigation." *Int'l Refugee Assistance Project v. Trump*, 404 F. Supp. 3d 946, 951 (D. Md. 2019) (citing *Fannin v. CSX Transp., Inc.*, 873 F.2d 1438, 1989 WL 42583, at *2 (4th Cir. 1989)). Courts commonly consider whether immediate appeal would result in a shorter trial, easier and more efficient discovery, simplified issues due to resolution of complex areas of law, or even the conclusion of the dispute altogether.

*See*, *e.g.*, *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 626 (D. Md. 2013).

By accepting this immediate appeal, the Court can determine the key issue at the outset of this litigation, reducing the need for extensive motions practice, discovery, and perhaps even trial. Resolving these threshold questions will advance the termination of the litigation by, at minimum, answering potentially dispositive threshold questions on the First Amendment claim. In addition, immediate review of these preliminary questions could terminate the litigation entirely since all four causes of action—including the equal protection claims—are premised on the asserted constitutional right to receive or access information from the government. (*See* ECF 5 at ¶¶ 166, 171, 175, 177, 180; *see also id*. at ¶¶ 7–8, 36, 129–31, 143, 149, 156, 163.)

That's particularly true here because Plaintiffs' equal protection claims lack independent viability once they're detached from their asserted right-to-receive underpinning. Under the library's policies, every child, teen, and adult—regardless of sexual orientation or gender identity—has the same access to the same materials as every other child, teen, or adult patron. The district court nevertheless concluded that the claims were plausible because the *impact* of the policy allegedly fell especially on members of the LGBTQ community. (ECF 44 at 31–32.) But that conclusion is inconsistent with recent precedent. *See Anderson v. Crouch*, 169 F.4th

474, 483–84 (4th Cir. 2026) (noting in an equal protection case involving alleged disparate impact on transgender people that "laws that apply evenhandedly to all 'unquestionably comply' with the Equal Protection Clause. . . . Indeed, the Supreme Court has made clear that the mere fact that a law primarily—or even exclusively—affects a protected class cannot alone establish an equal protection claim," and stating that in such situations the court will uphold an enactment "so long as there is 'any reasonably conceivable state of facts that could provide a rational basis'" for it) quoting *United States v. Skrmetti*, 605 U.S. 495, 522 (2025)).[4] So too here.

Immediate appeal of the order is likely to advance the ultimate termination of the litigation. The Court should accept the interlocutory appeal.

## II. This case and this stage of the proceeding present a suitable vehicle for consideration and resolution of the questions presented.

Resolution of the questions presented is appropriate in this case and at this procedural stage for four reasons.

*First*, the question of whether a plaintiff's claim rests on a cognizable right implicates the court's jurisdiction and the plaintiffs' standing and is, therefore, appropriately resolved at the outset of litigation. *See*, *e.g.*, *McConnell v. FEC*, 540 U.S. 93, 227 (2003) (holding the plaintiffs lacked standing because the Court had "never recognized a legal right comparable to the broad and diffuse injury asserted"

---

[4] The opinion in *Anderson* was issued less than three months ago, and the mandate was issued just today.

by plaintiffs); *Fleck & Assocs., Inc. v. Phoenix*, 471 F.3d 1100, 1104 (9th Cir. 2006) (holding that a corporation's suit alleging an unconstitutional invasion of its privacy should be dismissed for lack of standing because "corporations have no such privacy rights," noting that "[s]ince Fleck has not alleged the invasion of any cognizable right, it has failed to establish the 'irreducible constitutional minimum of standing'") (citation omitted); *Blade v. U.S. Bankruptcy Court*, 22 Fed. App'x 487, 487 (6th Cir. 2001) (affirming dismissal for lack of subject matter jurisdiction because "plaintiff's claims are not cognizable" under controlling precedent); *Arjay Assocs., Inc. v. Bush*, 891 F.2d 894, 896–98 (Fed. Cir. 1989) (affirming the dismissal of the plaintiff's constitutional claims and holding they "lack standing because the injury they assert is to a nonexistent right . . . and is thus nonredressable.").[5]

*Second*, interlocutory appeal is warranted because the questions presented in the petition are arising with increasing frequency. In South Carolina alone, at least four federal lawsuits are currently pending involving constitutional challenges to

---

[5] *See also Humaid v. Garland*, 714 F. Supp. 3d 201, 208 (W.D.N.Y. 2024) (dismissing under Rule 12(b)(1) because "Plaintiff has failed to establish a cognizable constitutional claim …. Failing to show that he possesses a legally protected interest, Plaintiff has no standing to bring this action."); *Straw v. United States*, 2023 WL 4828034, *1 n.1 (N.D. Cal. July 26, 2023) ("As a threshold matter, Plaintiff lacks Article III standing. Plaintiff is unable to allege . . . an actual injury to a legally protected right…. Because no such right exists … Plaintiff has not alleged actual injury to a legally protected right, and this Court cannot provide Plaintiff's requested relief.").

public library or public-school library curation.[6] And the same lawyers who brought this case are contemplating suing another South Carolina public library system, too. *See* Spencer Donovan, *Pickens library board pauses sweeping book review*, POST & COURIER (March 10, 2026) (noting the Pickens County, South Carolina library board was moving forward with a policy to review the children's and teen's sections for removal of inappropriate content and that the ACLU of SC was "concerned the Pickens County policy goes far beyond the Greenville policies"). And that's just one state. Even more cases are or soon will be percolating in the other states of this Circuit and across the nation.

By countenancing Plaintiffs' novel theory in this case that they have a right to receive information from the government, the district court applied new First Amendment restrictions to the activities performed by every library every day: culling, maintaining, and structuring its catalogue. This case—the first one to reach this Court involving a public library—offers the Court an opportunity to establish the law, provide guidance to the lower courts, library boards, and the public across the Circuit, and spare lower courts and litigants the time, effort, and expense of litigating and deciding cases that may turn out to lack any basis in the law.

---

[6] In addition to this case, the others are *SC State Conference of the NAACP et al. v. Weaver et al.*, No. 25-2216 (4th Cir.), *Pickens Cnty. Branch of the NAACP et al v. Sch. Dist. of Pickens Cnty.*, No. 8:26-cv-00144-JDA (D.S.C.), and *S.C. Ass'n of Sch. Librarians v. Weaver et al.*, No. 3:25-cv-12857-SAL (D.S.C.).

*Third*, interlocutory consideration of the questions presented in this case is appropriate even though similar questions are presented in two pending appeals arising from a different factual context, namely public-*school* library curation and curricula selection. *See SC State Conference of the NAACP et al. v. Weaver et al.*, No. 25-2216 (4th Cir.); *E.K. et al. v. Dept. of Defense Ed. Activity et al.*, No. 25-2497 (4th Cir.). Although it's possible the Court could rule on the right-to-receive and government speech arguments in those appeals, it's just as likely that the Court resolves them without addressing those questions.[7] More importantly, although this Court's guidance in the public-school context will be instructive in the public library context and vice versa, a ruling about the former might not, in the district court's view, be dispositive of the issues raised in the latter. (*See* ECF 44 at 27.)

*Fourth*, this Court's immediate review is warranted because, as noted above and as contemplated by Section 1292(b), it would further the interests of judicial economy and alleviate the potentially substantial burden and expense of litigation on the parties and publicly funded defendants. Resolution of these threshold

---

[7] In *Weaver*, for example, the district court dismissed the Amended Complaint for lack of redressability, and the Court could affirm without deciding whether public-school students have a right to receive information from the government of the type and format of the students' choosing. *See Weaver*, Resp. Br. (CA4 Dkt. 39) at 27 n.10, 39 n.12 (Feb. 19, 2026). In *DODEA*, the portion of the case involving library curation has apparently been mooted by the plaintiff's withdrawal from defendant's school. *DODEA*, Appellants Br. at 31–37 (March 30, 2026).

questions of law would materially advance (and perhaps conclude) this litigation and could also stem the rising tide of potential, future, similar suits in this Circuit,

## CONCLUSION

Because the district court's order involves controlling questions of law for which there are substantial grounds for difference of opinion, and because this Court's acceptance and resolution of the appeal would advance the ultimate termination of the litigation, the Court should grant the petition and set a schedule for briefing on the merits of the district court's order.

/s/ Miles E. Coleman
Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH LLP
2 West Washington Street / Suite 400
Greenville, SC 29601
(864) 373-2300
miles.coleman@nelsonmullins.com

Charles F. Turner, Jr.
John P. "Jack" Riordan
J. Nathan Ozmint
WILSON JONES CARTER & BAXLEY, P.A.
325 Rocky Slope Rd. / Suite 201
Greenville, SC 29607
(864) 672-3711
cfturner@wjcblaw.com
jpriordan@wjcblaw.com
jnozmint@wjcblaw.com

*Counsel for Defendants-Petitioners Greenville County Library System; Beverly James, in her official capacity as Executive Director of the Greenville County Library System, and Karen Allen, in her official capacity as Youth Services Manager of the Greenville County Library System*

22

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of <u>Federal Rule of Appellate Procedure 5(c)(1)</u> because it contains 4,820 words. This motion complies with the typeface and typeset requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)(A)</u> and 32(c)(2) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

June 8, 2026                                     /s/ Miles E. Coleman
                                                 Miles E. Coleman
                                                 Counsel for Defendants-Petitioners

## CERTIFICATE OF SERVICE

Undersigned counsel certifies that on June 8, 2026, a true and correct copy of the foregoing Petition was filed electronically using the Court's Electronic Case Filing System. In addition to any electronic service effectuated on the other parties' counsel by the ECF system, undersigned counsel certifies that on June 8, 2026, he has served a true and correct copy of the foregoing Petition and its two attachments on all parties counsel of record pursuant to Federal Rule of Appellate Procedure 5(a)(1).

June 8, 2026

/s/ Miles E. Coleman
Miles E. Coleman
Counsel for Defendants-Petitioners

00IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; | ) ) ) ) | No. 6:25-cv-02599-DCC |
| CHERYL ROGERS; | ) ) | |
| GREG ROGERS; | ) ) | |
| E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; | ) ) ) | |
| M.G., by and through her mother, Amber Galea; and | ) ) ) | |
| W.M., by and through his mother, Kersey Clark;, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| GREENVILLE COUNTY, SOUTH CAROLINA; | ) ) | |
| BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; and | ) ) ) ) | |
| KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System,, | ) ) ) ) | |
| Defendant. | ) ) | |

This matter is before the Court on Defendants' Motion to Dismiss.  ECF No. 20.

Plaintiffs filed a Response in Opposition, and Defendants filed a Reply.  ECF Nos. 27, 33.

Plaintiffs also filed two notices of supplemental authorities, to which Defendants filed one

reply.  ECF Nos. 37, 39, 38.  For the reasons set forth below, Defendants' Motion is

granted in part and denied in part.

## I.  BACKGROUND[1]

This case arises out of Greenville County Library System's (the "Library")

enactment of policies, both written and unwritten, that target books portraying Lesbian,

Gay, Bisexual, Transgender, and Queer ("LGBTQ") individuals.  *See* ECF No. 5.  The

Library is a public library system operated by Defendant Greenville County (the "County").

*Id.* at 4.  The Library is controlled and managed by a board of trustees ("the Board")

appointed by the Greenville County Council.  *Id.*  Defendant Beverly James ("James") is

the Executive Director of Greenville Library, and Defendant Karen Allen ("Allen") is the

Youth Services Manager of Greenville Library.  *Id.* at 5.  James and Allen are responsible

for carrying out policies enacted by the Board.  *Id.*

Plaintiffs are residents of the County and patrons of the Library.  *Id.* at 3–4.  Plaintiff

O.R. is 17 years old and brings his claims by and through his parents, Plaintiffs Cheryl

Rogers and Greg Rogers.  *Id.* at 3.  Plaintiff O.R. brings his equal protection claims on

behalf of himself and those similarly situated—namely, all minor, transgender library

patrons who lack adult library cards.  *Id.* at 4.  Plaintiffs E.G. and M.G. are, respectively,

---

[1] On a motion to dismiss, a plaintiff's well-pled allegations are accepted as true. Accordingly, this recitation of facts is taken from Plaintiffs' Amended Complaint.

11 and 12 years old and live with their mother, Amber Galea.  *Id.*  Plaintiff E.G. brings her equal protection claims on behalf of herself and those similarly situated—namely, all individuals with adult Greenville County library cards who identify as LGBTQ.  *Id.*  Plaintiff W.M. is 9 years old and brings his claims by and through his mother, Kersey Clark.  *Id*.

Over the last two years, the Library has systematically purged positive portrayals of transgender and non-conforming people through the use of both written and unwritten policies.  *Id.* at 2.  In 2024, the Library implemented two written policies (the "Written Policies"), which removed all material from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning."  *Id.* at 10–21.  Pursuant to the Written Policies, these materials were moved to the "Parenting and Early Childhood" ("PEC") section from which minors with juvenile or young adult library cards cannot check out books.[2]  *Id.* at 13.  In enacting the Written Policies, Board members of the Library stated that "the presence of a transgender

---

[2]  On February 13, 2026, Defendants filed a Motion for Extension of Time to File Supplemental Exhibit to their Motion to Dismiss.  ECF No. 42.  Defendants seek to file the declaration of James, who avers that each of the 13 locations of the Library now have a PEC section.  ECF Nos. 42 at 2; 42-1 at 3.  Defendants clarify that this supplemental document is meant only to support their arguments related to standing, for which the Court may consider it at this stage of litigation as it goes to the Court's jurisdiction.  ECF No. 42 at 2–3.  Defendants indicate that Plaintiffs opposed the requested extension and submission of a supplemental exhibit.  *Id.* at 3.  However, Plaintiffs filed no response in opposition to Defendants' Motion.  Upon review of Defendants' Motion, the Court finds that consideration of the supplemental documentation for the sole purpose of determining Plaintiffs' standing is appropriate and has so considered it.  Accordingly, Defendants' Motion is granted, and Defendants are directed to file the attached document as a supplemental exhibit to their Motion to Dismiss.  The Court notes, however, that the information included in Defendants' supplemental exhibit did not materially alter or impact the Court's analysis of standing.

character in a book . . . is grounds for relocating it to the adult section," materials representing gender transition are "trash," and that the "idea" of "transgenderism" is a "dangerous thing" and part of "a radical agenda" that the Library has "every right . . . to take an ethical and moral stand" against. *Id*. at 13–15, 19–20. In implementing the Written Policies, the Library has removed many titles from the juvenile and young adult section that positively portrayed transgenderism, including *Julián is a Mermaid* by Jessica Love, *Ana on the Edge* by A.J. Sass, and *Red: A Crayon's Story* by Michael Hall. *Id.* at 2. Meanwhile, books that advocate against gender transition—such as the Christian-themed book, *God made Boys and Girls* by Marty Machowski—remain available in the juvenile section. *Id.*

The Library also enforces a widespread custom and practice of discriminating against the collection, retention, and display of library materials—including books for adults—that positively portray LGBTQ individuals (the "Unwritten Policy"). *Id.* at 21–25. Under the Unwritten Policy, Defendants have removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by Library patrons to order new LGBTQ materials, and granted over 50 requests from the Greenville County Republican Women's Club to remove LGBTQ materials. *Id.* at 3, 22–25. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book club. *Id.* at 24–25.

Based on Defendants' conduct, Plaintiffs have asserted four causes of action: (1) Violation of the First Amendment based on the Written Policies ("Count One"); (2) Violation of the Fourteenth Amendment based on the Written Policies ("Count Two") ; (3)

Violation of the First Amendment based on the Library's widespread custom and practices pursuant to the Unwritten Policy ("Count Three"); and (4) Violation of the Fourteenth Amendment based on the Library's widespread custom and practices pursuant to the Unwritten Policy ("Count Four"). *Id.* at 31–36. Defendants responded to Plaintiffs' Amended Complaint with a Motion to Dismiss, arguing that the Plaintiffs lack standing to assert their claims and that Plaintiffs have failed to state any plausible claims for relief. ECF No. 20. Plaintiffs filed a Response in Opposition, and Defendants filed a Reply. ECF Nos. 27, 33. Plaintiffs have also filed two Notices of Supplemental Authority, to which Defendants replied only to the first Notice. ECF Nos. 37, 38, 39. On January 29, 2026, the Court held a hearing on Defendants' Motion to Dismiss. ECF No. 41. These Motions are now ripe for review.

## II.  APPLICABLE LAW

### A.  Standing

Article III of the United States Constitution limits the jurisdiction of federal courts to deciding only actual "cases" and "controversies." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). The doctrine of standing sets apart those "cases" and "controversies" that are of the justiciable sort referenced in Article III. *Id.* at 560. "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

"To establish injury in fact, a plaintiff must show that he . . . suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted). "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). For an injury to be concrete, the Supreme Court has "emphasized repeatedly" that it "must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (alteration, internal quotation marks, and citation omitted).

## B.  Failure to State a Claim

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted." Such a motion tests the legal sufficiency of the complaint and "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses . . . . Our inquiry then is limited to whether the allegations constitute 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (internal quotation marks and citation omitted). In a Rule 12(b)(6) motion, the court is obligated "to assume the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  However, while the Court must accept the facts in the light most favorable to the

nonmoving party, it "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Id*.

To survive a motion to dismiss, the complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the requirement of plausibility does not impose a probability requirement at this stage, the complaint must show more than a "sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

### III. DISCUSSION

### A. Standing

As an initial matter, the Court addresses the jurisdictional issue of whether Plaintiffs have Article III standing. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–102 (1998) (recognizing that standing to maintain a suit implicates the court's jurisdiction to entertain a suit and is thus a threshold question to be resolved before the merits); *see Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022) ("Because standing is a threshold jurisdictional question, we address it first." (cleaned up) (citations omitted)).  As outlined above, to establish standing, a party must allege that it suffered a "concrete" harm, there must be "a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant[,]" and the harm must be redressable. *Steel Co.,* 523 U.S. at 103.  The Supreme Court has also cautioned that the "absence of a valid . . . cause of action" does not implicate the court's "power to adjudicate the case." *Id.* at 89.  Accordingly, the Fourth Circuit has emphasized a court should "take care not to conflate a standing inquiry with a merits inquiry." *Beyond Sys., Inc. v. Kraft Foods, Inc.*,

7

777 F.3d 712, 715–16 (4th Cir. 2015).  Further, in analyzing standing, a plaintiff must establish standing as to "each claim" presented and "each form of relief" sought.  *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted).  Only one plaintiff must have standing for the case to proceed. *See Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 681 (4th Cir. 2020); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986).  Accordingly, the Court addresses standing for each of the claims raised by Plaintiffs below.

    1. First Amendment Claims

Plaintiffs assert two claims for violation of their First Amendment rights: one based on the Written Policies and another based on the Unwritten Policy.  ECF No. 5 at 31–33; 34–35.  Plaintiffs allege that they are all patrons of the Library and residents of Greenville County.  *Id.* at 4.  They also allege that the Library has removed books with LGBTQ themes from the juvenile and young adult sections of the Library and placed these books on separate shelves in the adult section of the Library, specifically the PEC section, pursuant to the Written Policies and that the Library also has an Unwritten Policy of removing books generally from all sections of the library that have positive LGBTQ themes as well as removing book displays and promotional material that feature LGBTQ themes and cancelling events that involve LGBTQ individuals or themes.  *Id.* at 2–3. Plaintiffs allege that the motivation for implementing these policies was based on viewpoint discrimination towards LGBTQ individuals.  *Id.* at 2, 10, 13, 16, 17, 19.  Plaintiffs further allege that they intend to check out and access books with LGBTQ themes and Defendants' Written and Unwritten Policies make it difficult or impossible to do so.  *Id.* at 26–30.  Some Plaintiffs have identified specific book titles that they were interested in

checking out from the juvenile and young adult sections of the Library that have been impacted by the Written Policies. *Id*. at 28, 29.

Defendants argue these allegations are insufficient to confer standing on Plaintiffs as they have failed to alleged injury in fact. ECF No. 20 at 8–11. Defendants contend Plaintiffs' allegations are nothing more than "someday" intentions to check out books without any description of concrete plans to do so. *Id.* at 2. Defendants also argue that Plaintiffs do not allege that any book title has been made inaccessible by the Library's Written Policies as individuals may still walk to these books in the Library and check out titles that have been moved to the PEC section with an adult library card. *Id.* at 10. Defendants also assert that the Written Policies in question are aimed at children, who have fewer constitutional protections than adults and that the minor Plaintiffs have not suffered an Article III injury in light of the Library's recognition of and deference to the parents' right to supervise their children. *Id.* at 11. Additionally, to the extent Plaintiffs allege they feel the Written and Unwritten Policies are unfair, Defendants contend that feeling a policy is unfair is nothing more than a psychological injury insufficient to confer standing. *Id.* at 9, 12.

Plaintiffs contend that they have sufficiently alleged they have standing to bring their claims. ECF No. 27 at 8–14. According to Plaintiffs, the Written and Unwritten Policies burden all of Plaintiffs' ability to access restricted materials. *Id.* at 9. Plaintiffs assert that the Written and Unwritten Policies interfere with protected interests under the First and Fourteenth Amendments and they have alleged injury in fact based on the restriction on access to information. *Id*. Plaintiffs further assert that, while at least some have alleged an intent to access a specific book affected by the Written Policies, there is

9

no need to assert intent to access specific removed books to establish standing because, unlike in other cases, Defendants are not attempting to remove specific books but an entire class of ideas and perspectives. *Id.* at 11–13. According to Plaintiffs, their injuries result from restrictions to their Library access and is not a future injury but ongoing and will continue until their access is restored. *Id.* at 13. Plaintiffs further argue that Defendants' attempt to reduce Plaintiffs' injuries to mere psychological distress is unavailing, especially where feelings of marginalization have been recognized as cognizable forms of injury under the First Amendment. *Id.* at 13–14.

   a. *Standing Exists as to Count One: The Written Policies*

As to the Written Policies, Plaintiffs allege at least one Plaintiff has attempted to check out a book from the Library but was unable to because of the Written Policies. Specifically, Plaintiffs E.G., M.G., and W.M. allege that they intended to check out specific titles that have been moved pursuant to the Written Policies, which restricts their First Amendment right to receive information. *Id.* at 28, 29. Courts have found that similar factual allegations satisfy the injury-in-fact requirement for standing. *See, e.g., E.K. by & through Keeley v. Dep't of Def. Educ. Activity,* 807 F. Supp. 3d 517, 532 (E.D. Va. 2025) (finding at least one plaintiff had suffered an injury in fact from book removals where she had attempted to check out three specific books that had been removed); *PEN Am. Cntr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d 1325, 1329–30 (N.D. Fla. 2024) (holding that student-plaintiffs had established standing on a First Amendment challenge to book removals where "the children intended to check out specific removed and restricted books during the upcoming (now, ongoing) school year, but they are unable to do so"); *ACLU of Florida, Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1194–95 (11th Cir. 2009)

(finding that a student had established an injury for standing purposes when he alleged that the school's policy of removing books prevented him from checking out a particular book that he intended to check out "after school resumed in six weeks").  The Court likewise finds Plaintiffs' allegations are sufficient to establish that Plaintiffs have suffered a concrete and particularized harm based on Defendants' implementation of the Written Policies.

Defendants' arguments to the contrary are unpersuasive.  First, the minor Plaintiffs ability to browse the PEC section and check out books with parental consent does not address Plaintiffs allegations that the Written Policies are nevertheless restrictive, even if not tantamount to an outright prohibition.  State action that impedes a plaintiff's ability to access information is sufficient to establish a concrete injury to confer standing for a First Amendment claim.  *See, e.g.*, *Virden v. Crawford Cnty., Arkansas*, No. 2:23-CV-2071, 2023 WL 5944154, at *3 (W.D. Ark. Sept. 12, 2023) ("When a plaintiff shows that her ability to access information has been impeded by state action, however minimally, then that is a sufficiently concrete injury to confer standing for a First Amendment claim." (citations omitted)).  Second, Defendants' argument that Plaintiffs do not have standing because there is no right to receive information from the government overlooks both precedent in cases related to library services and the very purposes of the government services libraries generally are intended to fill.  As outlined above, multiple courts have recognized standing to challenge book removals in publicly funded libraries pursuant to the First Amendment.  Again, Defendants' argument overlooks the very purpose of libraries, and indeed, the alleged stated mission of the Library in this action—"[t]o champion literacy, inspire learning, and foster community connection," its vision is "[t]o be

11

Greenville County's first choice for exploration, discovery, and information," and it "remains dedicated to providing free access to materials, experiences, and resources to communities throughout Greenville County."[3]  ECF No. 5 at 6–7.

Finally, Defendants' arguments that the minor Plaintiffs' rights have not been restricted or impeded because the Written Policies allow their parents to determine what is appropriate and thus have not suffered an injury in fact overextends the law in this area. Indeed, a parent's right to raise their children is imbedded in the Constitution.  However, this does not mean that minors cannot suffer an injury in fact because a government entity enacts a regulation that restricts their access to certain speech.  Indeed, the Supreme Court has found similar regulations did create a cognizable injury that could be redressed by the courts.  *See, e.g., Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) (finding that a regulation which only gave parents veto power over the government's own discretionary choice of what is best for their children violated the First Amendment).  In that case, the Supreme Court explained "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them."  *Id*. at 794

---

[3] Defendants' arguments related to the right to receive information from the government raised in the 12(b)(6) portion of their brief relies heavily on the reasoning in *Little v. Llano Cnty.*, 138 F.4th 834, 837 (5th Cir. 2025).  ECF No. 20 at 2, 17.  The Court addresses Defendants' 12(b)(6) arguments more fully below.  As Defendants' argument concerning the right to receive information under the First Amendment relates to standing, however, the Court notes that in *Little*, the district court found that the plaintiffs had standing to bring their claim, and the Fifth Circuit, while acknowledging that standing was an issue before the district court, did not disturb the district court's standing finding on appeal.  *See Little*, 138 F.4th at 839; *Little v. Llano Cnty.*, No. 1:22-CV-424-RP, 2023 WL 2731089, at *5 (W.D. Tex. Mar. 30, 2023); *see also In re United Operating, LLC*, 540 F.3d 351, 354 (5th Cir. 2008) (explaining that the court of appeals is "obliged to ensure [standing] is satisfied regardless whether the parties address the matter").

(alteration in original) (quoting *Erznoznik v. City of Jacksonville*, <u>422 U.S. 205, 212</u>–13 (1975)).

Here, Plaintiffs allege that the Library has removed books from the juvenile and young adult sections where children and their parents would expect to find them and created a burden on the access of information.  At least one Plaintiff has identified specific books of interest to her that have been impacted by the Written Policies.  ECF No. 5 at 28, 29.  This is a sufficiently concrete burden on Plaintiffs' ability to access information to give them standing to bring this lawsuit.  Because at least one individual has standing as to this claim, the Court need not address standing of the other individual Plaintiffs.  The fact that Plaintiffs have adequately pled standing as to this claim does not necessarily mean that they will be able to prevail on the merits of their claims.  But Defendants' arguments about the alleged weaknesses in Plaintiffs claims of injuries blurs the lines between the whether Plaintiffs' claims of injury have merit and whether they have standing to bring their claims, which, as stated above, both the United States Supreme Court and the Fourth Circuit Court of Appeals strongly caution against.

b.  *Standing Does Not Exist as to Count Three: The Unwritten Policy*

Turning to the Unwritten Policy, Plaintiffs allege that pursuant to this Policy, Defendants have removed dozens of LGBTQ titles from the Library collection for both children and adults, disproportionately refused requests by Library patrons to order new LGBTQ materials, and granted over 50 requests from the Greenville County Republican Women's Club to remove LGBTQ materials. Defendants have also ordered librarians to remove book displays that feature LGBTQ materials, cancelled library events that involve LGBTQ individuals or themes, and removed promotional materials for a LGBTQ book

club.  Plaintiffs allege that "[u]pon information and belief, numerous additional LGBTQ-related juvenile and young adult titles have been removed from the Library system since October 2023," and provide a list of multiple titles that have allegedly been removed pursuant to the Unwritten Policy.  ECF No. 5 at 23.  Specifically, Plaintiffs allege that Plaintiffs Cheryl and Greg wish to be able to access the full array of LGBTQ-related books, including titles the Library has removed from its shelves.  *Id.* at 27.  Plaintiffs have identified 36 adult LGBTQ-related titles and 23 juvenile and young adult titles that have been removed entirely from the Library allegedly pursuant to the Unwritten Policy.  *Id.* at 5–6.

Defendants' alleged actions could potentially cause injury to someone, but Plaintiffs fail to make any allegations to tie these potentially injurious actions to their own particularized and concrete injuries.  Unlike their allegations regarding the Written Policies, Plaintiffs have not identified any specific books that they intended to check out that have been removed or denied procurement thereof pursuant to the Unwritten Policy nor do Plaintiffs allege that they wished to attend events or clubs that have been impacted by the Library's Unwritten Policy.  *See id.*  While Plaintiffs argue that their injuries are caused by the systematic removal of books that reflect an entire class of ideas and perspectives, they make no allegation that all books pertaining to LGBTQ individuals have been removed from the Library.  Indeed, at the hearing, Plaintiffs conceded that books with positive LGBTQ themes were still available for check out at the Library.  Again, this is unlike Plaintiffs' allegations concerning the Written Policies where all positive portrayals of transgender individuals were moved to a separate section of the Library.

Here, Plaintiffs only specific allegations of injury related to the Unwritten Policy are that Plaintiffs Cheryl and Greg would like to access LGBTQ-related books, including generally those that the Library has removed. *Id.* at 27. These allegations are far too remote and speculative to sufficiently allege an injury. *See, e.g.*, *Lujan,* 504 U.S. at 560 (explaining that to establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."); *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (explaining that standing requires that the plaintiff "'personally has suffered some actual or threatened injury'"). The Court finds that Plaintiffs have failed to allege with sufficient particularity an injury in fact based on these Policies. Accordingly, Plaintiffs' First Amendment claim based on the Unwritten Policy is dismissed for lack of standing.

2. Equal Protection Claims

Plaintiffs assert two causes of action based on the Equal Protection Clause of the Fourteenth Amendment: again, one based on the Written Policies and one based on the Unwritten Policy. ECF No. 5 at 33–34, 35–36. The Constitution instructs all who act for the government that they may not "deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV, § 1. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, . . . [t]he 'injury in fact' in an equal protection case of this variety is the

denial of equal treatment resulting from the imposition of the barrier." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). Plaintiffs allege that the Written and Unwritten Policies discriminates against Library patrons, like Plaintiffs O.R. and E.G., on the basis of their transgender or LGBTQ status. ECF No. 5 at 33, 35. Defendants argue that Plaintiffs have failed to allege an injury in fact based on a denial of equal treatment because the barrier imposed by the Written and Unwritten Policies applies equally to all patrons. ECF No. 20 at 13. Plaintiffs argue that the barrier imposed by Written and Unwritten Policies have thwarted their attempts to receive the benefits of the Library, and this barrier that makes it harder for members of one group—members of the LGBTQ community—to obtain a benefit than it is for members of another group—non-members of the LGBTQ community. ECF No. 27 at 10, 14.

The Court finds that Plaintiffs have made sufficient allegations to show they have suffered an injury in fact caused by both the Written Policies and the Unwritten Policies. As relevant to these claims, Plaintiffs O.R. and E.G. allege they are members of a protected class of individuals, as a transgender boy and a queer-identifying girl. ECF No. 5 at 30–31. O.R. and E.G. are both minor patrons of the Library and residents of the County. O.R. does not have access to the adult section of the Library and so may not check out books from the PEC section on his own behalf, and thus O.R. may not check out books with positive portrayals of transgender characters pursuant to the Written Policies. However, under the Written Policies, O.R. may check out books that advocate against transgenderism, such as *God Made Boys and Girls*, that are still available to him for check out in the juvenile section. Similarly, E.G., who has an adult library card and

may check out books on her own from the PEC section, at the age of 12 is unable to find and check out books positively reflecting LGBTQ characters like her in the section of the Library targeting her age group but can find books in the section targeting her age group that negatively portray characters like her. O.R. and E.G. also allege that the Unwritten Policy has caused stigmatic harm when the Library removed books containing LGTBQ themes or characters, refused requests for new materials, cancelled LGBTQ events or clubs, and prohibited promotions of LGBTQ events or clubs. *Id.* at 30, 31.

Defendants' argument that the Written and Unwritten Policies equally affect all patrons, regardless of transgender status, ignores those equal protection cases based on facially neutral laws. It is, by definition, the case that a facially neutral law will, "on its face," treat all citizens "in an identical manner." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969). The Equal Protection Clause also provides protection from facially neutral laws where "the reality is that the law's impact falls on the minority." *Id.* In the instant case, Plaintiffs allege that Defendants' Written and Unwritten Policies result in just that. According to Plaintiffs, it is transgender and LGBTQ individuals who will find that books relating to their lived experiences have been segregated or removed altogether from the Library. Indeed, taking all inferences in Plaintiffs' favor, under the Written Policies, Defendants have removed only the *positive* portrayals of transgender characters from the juvenile and young adult sections of the Library and left arguably stigmatizing negative portrayals of transgenderism. Courts have found such stigmatization by a government entity could constitute an injury in fact under the Equal Protection Clause. *See, e.g. Heckler v. Mathews*, 465 U.S. 728, 739–40, 104 S. Ct. 1387, 1395, 79 L. Ed. 2d 646 (1984) ("[W]e have repeatedly emphasized, discrimination itself, by perpetuating 'archaic

and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." (citing *Mississippi University for Women v. Hogan,* 458 U.S. 718, 725 (1982)).  Likewise, Plaintiffs allege they have suffered similar stigmatization from the Unwritten Policy.  While Plaintiffs' claims of injury based on the Unwritten Policy are somewhat thin, at this stage of litigation and accepting Plaintiffs' allegations as true and making all inferences in their favor, the Court finds they have sufficiently alleged an injury in fact to confer standing.  At this stage of litigation, the Court finds Plaintiffs' allegations are sufficient to allege that the Written and Unwritten Policies resulted in the denial of equal treatment and are accordingly sufficient to allege injury caused by the denial of the equal protection of the laws.

## B.  Failure to State a Claim

Defendants also assert that Plaintiffs have failed to state a claim upon which relief can be granted.  The Court addresses each of Plaintiffs' claims below.

### 1.  Count One: First Amendment Claim

Defendants contend that Plaintiffs have failed to state a claim for violation of their First Amendment rights based on the Written Policies.  ECF No. 20 at 24–37.  While Defendants concede the First Amendment limits the government's power to prevent a person from receiving another's speech, they argue it also does not obligate the government to provide access to that speech either.  *Id.* at 24–27.  Defendants further contend that the Library's selection and placement of materials in their facilities constitutes government speech, which the First Amendment does not regulate.  *Id.* at 27–

34.  Defendants assert the Written Policies are viewpoint neutral because they apply to all books geared towards 0- to 12- and 13- to 17-year-olds that deal with gender transitioning.  *Id.* at 34–37.

Plaintiffs argue that Defendants' Written Policies selectively punish or suppress speech and that the First Amendment prohibits removal or restriction of library materials based on viewpoint discrimination.  ECF No. 27 at 14–25.  Plaintiffs assert that their allegations are sufficient to state a claim because the First Amendment prohibits government actors, like Defendants, from removing books from library shelves because they dislike the ideas contained in those books.  *Id*. at 15–20.  Plaintiffs argue that even though the government may make content-based distinctions to ensure speech is compatible and reasonable in light of the purpose of that forum when it creates a nonpublic forum, any restrictions must still be viewpoint neutral.  *Id.* at 17.  According to Plaintiffs, the Written Policies are not viewpoint neutral and instead are aimed at suppression of ideas, which would distort the usual function of the Library and be inconsistent with its purpose.  *Id.* at 20–22.  Specifically, Plaintiffs contend their allegations that the Written Policies were adopted with goal of taking an ethical and moral stance against the so-called "dangerous" and "radical" agenda of transgenderism are a paradigmatic example of unconstitutional viewpoint discrimination.  *Id.* at 20.  Plaintiffs further argue that the Library's curation actions are not government speech and that Defendants, as government actors, are bound by the First Amendment and not protected by it.  *Id.* at 22–25.  Plaintiffs assert that invocation of parental rights does not justify the

Written Policies because rather than enforcing parental authority they impose government authority subject only to a parental veto.  *Id.* at 25.

### a. *Government Speech*

First, concerning the Library's curation decisions pursuant to the Written Policies, the Court is not convinced that Defendants' decisions regarding the shelving of books at their facilities constitute government speech.  Ordinarily, the First Amendment's Free Speech Clause "restricts government regulation of private speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).  However, the "government speech doctrine" creates a rare and limited exception where when the government speaks, "it naturally chooses what to say and what not to say" without the restrictions of viewpoint neutrality under the First Amendment.  *Shurtleff v. City of Boston*, 596 U.S. 243, 251 (2022); *see also Pleasant Grove*, 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted).  In *Shurtleff*, the Supreme Court laid out a "holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." 596 U.S. at 252.  This inquiry considers evidence of "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.*  As noted by other courts, these factors "are fact-intensive and generally not amenable to resolution at the motion to dismiss stage."  *See, e.g.*, *PEN Am*, 711 F. Supp. 3d at 1331; *Penguin Random House LLC v. Gibson*, No. 6:24-CV-1573, 2025 WL 902041, at

*8 (M.D. Fla. Feb. 28, 2025); *Gundy v. City of Jacksonville Fla.*, 50 F.4th 60, 76 (11th Cir. 2022).

Based on alleged purpose of the Library, and "the fact that the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints," the Court is not convinced that the contents of the Library constitute the government's endorsement of the views expressed in the books in its circulation. *PEN Am.*, 711 F. Supp. 3d at 1331. The controlling case law regarding the government speech doctrine cited by Defendants is readily distinguishable. *See, e.g.*; *Pleasant Grove*, 555 U.S. at 472–74 (finding that the city's decisions in curating monuments for display in a public park constituted government speech); *ACLU of N. Carolina v. Tennyson*, 815 F.3d 183 (4th Cir. 2016) (finding that the state's decision to approve and offer a "Choose Life" license plate while rejecting a pro-choice plate amounted to government speech). Because a library collection is a varied collection of numerous ideas, some of which are readily contradictory, the Court finds that it is materially different from government-sponsored speech such as license plates, art exhibits, and monuments on public property, where a single message is meant to be conveyed. Indeed, it is entirely plausible, based on the multitude of messages delivered through the variety of books in the Library, that the Library's curated collection should be viewed as private, not government, speech. As to those cases that find that a library engages in government speech through its curation decisions, there are as many cases that find it does not. *Compare, e.g.*, *People for the Ethical Treatment of Animals v. Gittens,* 414 F.3d 23, 28 (D.C. Cir. 2005) ("With respect to the public library, the government speaks through its selection of which books to put

on the shelves and which books to exclude."); *Bryant v. Gates,* 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries[.]"); *Little,* 138 F.4th at 865 (Duncan, J., plurality op.) (finding that a public library's collection decisions are government speech), *with PEN Am.,* 711 F. Supp. 3d at 1331 (declining to apply the government speech doctrine to a library collection because a library collection "is materially different from the speech embodied in government-sponsored parades, prayers, art exhibits, and monuments on public property"); *GLBT Youth in Iowa Schs. Task Force v. Reynolds,* 114 F.4th 660, 667–68 (8th Cir. 2024) (finding the government speech doctrine inapplicable to the placement and removal of books in public school libraries as "public school libraries do not share the characteristics of monuments in a park" because there is no coherent message spoken by library curation which amount to more than "babbling prodigiously and incoherently" and also considering the Supreme Court's directive to "exercise great caution before extending our government-speech precedents" (citing *Matal v. Tam,* 582 U.S. 218, 235 (2017)).

Given this contradictory persuasive precedent, the readily distinguishable factual background in the controlling precedent, the Supreme Court's directive to apply caution in extending the government speech doctrine, and the procedural posture of this action, the Court declines to find the government speech doctrine extends to library curation at this juncture. Having found that, based on Plaintiffs' allegations, the Written Policies are not immune from First Amendment scrutiny under the government speech doctrine, the

Court turns its attention to whether Plaintiffs have plausibly alleged a First Amendment claim against Defendants.

> b. *First Amendment Claim*

As an initial matter, the Parties disagree on whether the right asserted by Plaintiffs exists under the First Amendment. *See* ECF Nos. 20 at 24–27; 27 at 15–22. Defendants assert that Plaintiffs have no "right to receive" information from the Library, and the government cannot be compelled to provide certain information to the public under the First Amendment. ECF No. 20 at 24–27. Based on Defendants' arguments, it is their position that they acted within constitutional bounds when they imposed the Written Policies, which removed books containing positive portrayals of transgenderism from the juvenile and young adult sections and placed them in the PEC section, which indisputably has restrictions that inhibit checking out books from this section by minors without an adult library card. *Id.* Plaintiffs argue that Defendants' conduct is exactly the type of viewpoint discrimination proscribed by the First Amendment. ECF No. 27 at 15, 22. Thus, the issue before the Court is whether a public library may, without violating the First Amendment, enforce a policy that results in moving books based on their content to a separate, more restrictive section of the library.

First and foremost, the right under the First Amendment not only to share information but also to receive it has been recognized in certain contexts. *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas."); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972) (citing cases). Here, the question is whether this right exists in the context of a public

23

library.  The Parties disagree as to whether one of the singular Supreme Court cases on point, *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), is of value in the Court's analysis of whether Plaintiffs' alleged First Amendment right exists given that it is a plurality decision.  Defendants cite several circuit court decisions where other courts have found that *Pico* has minimal value in aiding with the lower court's decision on First Amendment issues.  ECF No. 20 at 35.  At oral argument, the Court acknowledged that "*Pico* is kind of like Forrest Gump's box of chocolates. It just depends on which opinion you reach into as to what you get."  ECF No. 43 at 6.  However, the Fourth Circuit has never made a finding that *Pico* was of no value, and other district courts within this circuit have repeatedly relied on *Pico* for guidance, including in the context of public library curation decisions.  *See, e.g.*, *E.K.,* 807 F. Supp. at 539–44; *Cline v. Fox*, 319 F. Supp. 2d 685, 690–91 (N.D.W. Va. 2004); *Mainstream Loudoun v. Board of Trustees of the Loudoun County Library, et al.,* 2 F. Supp. 2d 783, 794–95 (E.D. Va. 1998).  Likewise, the Court finds *Pico* provides guidance for the scope of First Amendment rights in this context.

In *Pico*, the Supreme Court was tasked with reviewing the decision of a local board of education to remove certain books from school libraries based on the board's belief that the books were "anti-American, anti-Christian, anti-Sem[i]tic, and just plain filthy." 457 U.S. at 856 (alteration original).  The Second Circuit had reversed the district court's grant of summary judgment to the school board on plaintiff's First Amendment claim.  A divided Supreme Court voted to affirm the appellate court's decision to remand the case for a determination of the school board's motives, but no majority opinion was issued.

Justice Brennan, joined by three Justices, issued the plurality opinion, which held that the First Amendment necessarily limits the government's right to remove materials on the basis of their content from a school library.  *See id.* at 864–69 (plurality op.).  Justice Brennan reasoned that the right to receive information is inherent in the right to speak and that "the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge."  *Id.* at 866 (quoting *Griswold v. Connecticut,* 381 U.S. 479, 482 (1965); *Stanley,* 394 U.S. at 564).  Accordingly, Justice Brennan extended the so-called "right to receive information" to a limited extent to the context of public school libraries and held that the school board members could not remove books "simply because they dislike the ideas contained [in them]," thereby "prescrib[ing] what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *Id.* 457 U.S. at 872 (quoting *W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943)) (internal quotation marks omitted).  Justice Brennan noted that the limit on this right to receive information in the context of public-school libraries was the great discretion entitled to public schools "to establish and apply their curriculum in such a way as to transmit community values" and thus public-school libraries may remove books for reasons of educational suitability, for example pervasive vulgarity.  *Id.* at 863–64, 872.  Thus, under Justice Brennan's plurality, the state actor's motivation in implementing the restrictive policy was key in determining whether its action violated the First Amendment.  *Id.* at 871.

In his concurring opinion, Justice Blackmun agreed that schools could not impermissibly suppress books based on the ideas within them absent sufficiently compelling reasons, though he adopted a narrower view of the constitutional "right to

receive information." *Id.* at 877–78 (Blackmun, J., concurring).   Justice Blackmun recognized though, even considering the dissent's discussion of the unique role of a school board as educators, that "surely difficult constitutional problems would arise if a State chose to exclude 'anti-American' books from its public libraries—even if those books remained available at local bookstores." *Id.* at 881.   Justice White's concurrence, on the other hand, concurred only in the judgment and found it unnecessary to "issue a dissertation on . . . the First Amendment" absent further findings of fact from the district court. *Id.* at 883 (White, J., concurring).

Chief Justice Burger, in his dissent, agreed that "students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate,'" but rejected the idea "of a 'right' to have the government provide continuing access to certain books" and that "school in particular ought not be made slavish courier of the material of third parties," especially where these "[b]ooks may be acquired from bookstores, *public libraries*, or other alternative sources unconnected with the unique environment of the local public schools." *Id.* at 886–92 (Burger, J., dissenting) (emphasis added).   Finally, Justice Rehnquist, in dissent, found that past decisions by the Supreme Court recognizing the right to receive information under the First Amendment were unlike this case "where the removed books are readily available to students and non-students alike at the corner bookstore or the public library." *Id.* at 912.   Justice Rehnquist recognized the unique nature of libraires in public schools, which unlike university or public libraries, "are not designed for freewheeling inquiry" but instead "are tailored, as the public[-]school curriculum is tailored to the teaching of basic skills and ideas." *Id.* at 915.

As recognized by Justices in both the plurality, concurrences, and dissents of *Pico*, public libraries offer a slightly different context for First Amendment analysis, as opposed to public-school libraries. In the context of *Pico*'s applicability to public libraries, the Court finds *Mainstream Loudoun v. Board. of Trustees of Loudoun County Library*, 2 F. Supp. 2d 783 (E.D. Va. 1998), to be instructive. In *Mainstream*, the district court was tasked with determining whether the public library's policy restricting internet access to adult-oriented websites violated the First Amendment. *Id.* at 787. The library board moved to dismiss the action and argued that "any limitation on their discretion to remove materials would force them to act as an unwilling conduit of information, and urge this [c]ourt to adopt the position of the *Pico* dissent," by Justice Burger that "the right to receive information and ideas does not carry with it the concomitant right to have those ideas affirmatively provided at a particular place by the government." *Id.* at 794. The district court explained that adopting this position would "require this Court to ignore the *Pico* plurality's decision to remand the case" and also to ignore the context of the *Pico* decision in the public school library context, wherein "all the Justices, including the dissenters, recognized that any discretion accorded to school libraries was uniquely tied to the public school's role as educator." *Id.*

The district court explained further that "neither the dissent nor the plurality of *Pico* can be said to support defendants' argument that public libraries enjoy unfettered discretion to remove materials from their collections." *Id.* The district court concluded that, to the extent that *Pico* was applicable, it stood "for the proposition that the First Amendment applies to, and limits, the discretion of a public library to place content-based

27

restrictions on access to constitutionally protected materials within its collection." *Id.* at

794.  Thus, "[c]onsistent with the mandate of the First Amendment, a public library, 'like

other enterprises operated by the State, may not be run in such a manner as to 'prescribe

what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.* at

794–95 (quoting 876 (Blackmun, J., concurring)).

Plaintiffs plausibly allege that the Written Policies do not pass constitutional muster

under this standard.  As outlined above, Plaintiffs allege the Written Policies resulted in a

restriction of access to books with positive portrayals of transgenderism because minors

cannot freely check out books from the PEC section of the Library.  Plaintiffs further put

forth multiple allegations that plausibly support that this restriction on access to materials

was based on Defendants' ideological objections to the books, including Defendants'

alleged statements in enacting the Written Policies.  Based on these allegations, there is

a plausible inference that the decision to enact the Written Policies was based on

Defendants' ideological objections to the books' content or disagreement with their

messages or themes rather than a viewpoint neutral reason.[4]  The Court's decision does

---

[4] These allegations sufficiently support the inference that the Written Policies were enacted as a form of viewpoint discrimination against positive speech about LGBTQ individuals and transgenderism.  The Fourth Circuit has explained that, in all types of forums, "a policy . . . that does not provide sufficient criteria to prevent viewpoint discrimination . . . generally will not survive constitutional scrutiny" and further that "viewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to *protect* against the improper exclusion of viewpoints."  *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 387, 384 (4th Cir. 2006) (emphasis in original) (citations omitted).  Accordingly, because it is plausible, drawing all inferences in Plaintiffs' favor, that Defendants' alleged conduct would not survive under any level of scrutiny, the Court does not engage in a full forum analysis at this time.

not compel Defendants to provide certain information to Plaintiffs. Rather it enforces limited First Amendment protections because Defendants "[h]av[e] chosen to provide access" to the speech in these books and they "may not thereafter selectively restrict certain categories of . . . speech because it disfavors their content." *Id.* at 795–96; *see also Lamont v. Postmaster Gen. of U. S.,* 381 U.S. 301, 310 (1965) (Brennan, J., concurring) ("If the Government wishes to withdraw a subsidy or a privilege, it must do so by means and on terms which do not endanger First Amendment rights.").

Defendants' arguments that Plaintiffs have failed to state a claim because minors do not have the same protections under the Constitution as adults are also unconvincing. As outlined above, even considering parents' constitutional right to raise their children, minors are still entitled to broad First Amendment protection. *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212–13). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14). While Defendants without a doubt have the authority to enforce a prohibition that a parent puts in place to prevent their child from accessing information, the Supreme Court found this authority to enforce does not equate to authority to block minors' access to constitutionally protected speech until their parents give their consent. *See id.* Plaintiffs have alleged that the Written Policies create the same parental veto-only block of constitutionally protected speech. Accordingly, the Court finds that Plaintiffs' allegations are sufficient to state a First Amendment claim

29

based on the Written Policies and Defendants' Motion to Dismiss is denied as to this claim.

2. Counts Two and Four: Equal Protection Claims

Plaintiffs assert two claims for equal protection: one based on the Written Policies and one based on the Unwritten Policy. ECF No. 5 at 33–34, 35–36. Defendants argue that both of these claims should be dismissed. ECF No. 20 at 37–41. According to Defendants, Plaintiffs' equal protection claims are nothing more than reframing of his First Amendment claims because they allege that Plaintiffs are subject to unequal treatment because they are preventing them from accessing certain library materials, which is effectively the same as Plaintiffs' right to receive information argument under their First Amendment claims. *Id.* at 37–38. Defendants further contend that Plaintiffs have failed to state a claim because they have not sufficiently alleged how the Written and Unwritten Policies discriminate based on the sex or LGBTQ status of patrons. *Id.* at 38–41. Plaintiffs argue that they have sufficiently alleged that the Written and Unwritten Policies led to different treatment for LGBTQ Plaintiffs, as well as the classes they seek to represent, because the Written and Unwritten Policies create a system where transgender and LGBTQ patrons are uniquely banished to a separate section of the Library to attempt to find stories that represent their experiences. ECF No. 27 at 26–36. Plaintiffs further argue that the Written and Unwritten Policies intentionally inflict stigma upon LGBTQ patrons by segregating these materials and that the equal application reasoning has repeatedly been rejected by other courts. *See id.*

30

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  "The equal protection requirement 'does not take from the States all power of classification,' but 'keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 271 (1979); *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992)). To succeed on an equal protection claim, Plaintiffs "must first demonstrate that [they] ha[ve] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination."  *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001).  If Plaintiffs make this showing, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."  *Id.*

First, as to Defendants' argument that Plaintiffs' equal protection claims are nothing more than a repackaging of their First Amendment claims, the Court disagrees. Plaintiffs allege they are members of an identifiable group, specifically LGBTQ-identifying Library patrons, and that this membership forms the basis of their equal protection claims. Plaintiffs allege that the Written and Unwritten Policies inflict equal protection injuries based on the impediment on their "ability to access library materials positively reflecting themselves and their families," and also the "dignitary harm and unconstitutional stigma" of their LGBTQ "identities and experiences" being treated as "unacceptable and unworthy of inclusion in public space."  ECF No. 5 at 33, 35.  These allegations, while related to Plaintiffs' First Amendment claims, are distinguishable because they discuss the Written

31

and Unwritten Policies' impact on an identified group of the Library's patrons. Unlike the cases cited by Defendants, Plaintiffs have alleged more than just disparate treatment through discrimination against their viewpoint. Accordingly, the Court finds that Plaintiffs have sufficiently alleged an equal protection claim that is separate from their First Amendment claim.

Turning to the sufficiency of Plaintiffs' allegations, the Court finds Plaintiffs' allegations are sufficient to show "[they] been treated differently from others with whom [they are] similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison,* 239 F.3d at 654. Here, Plaintiffs have alleged that they are members of a recognized class—LGBTQ-identifying Library patrons—and that Defendants' Policies explicitly classify books that positively reflecting this protected status for removal and segregation, resulting in unequal treatment of the Plaintiffs and a powerful stigma against them. Specifically—and significantly—Plaintiffs allege that books that negatively portray their protected status remain readily available and unaffected by Defendants' Policies. Furthermore, Plaintiffs have included allegations of comments by the Board which plausibly suggest that the motivation for implementing these Policies was based in animus related to Plaintiffs' protected status rather than a compelling government interest. Moreover, the alleged language of the Written Policies specifically targets positive portrayals of transgender individuals.

At this early stage of the litigation, the Court must assume the facts alleged in the Amended Complaint to be true and draw all reasonable inferences in Plaintiffs' favor. *See Iqbal,* 556 U.S. at 678. In doing so, the Court finds that Plaintiffs have alleged sufficient

32

facts to suggest that Defendants' Policies result in transgender-based disparate treatment because they allow for books that negatively portray Plaintiffs' protected class to remain readily available while restricting access to positive portrayals.  *Cleburne* 473 U.S.at 448 ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984)); *C & H Co. v. Richardson*, 78 F. App'x 894, 902 (4th Cir. 2003) (explaining that discriminatory purpose implies that the decisionmaker in enacting the policy "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' [their] adverse effects upon an identifiable group" (quoting *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279 (1979)).

Turning to the second inquiry, whether the disparity in treatment can be justified under the requisite level of scrutiny, the Court also finds Plaintiffs' allegations are sufficient at this stage of litigation. Under controlling law, classifications based on sex—including status as LGBTQ and transgender—are subject to intermediate, or "quasi-suspect," scrutiny.  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607–08 (4th Cir. 2020); *Obergefell v. Hodges*, 576 U.S. 644, 674 (2015).  Governmental action that discriminates on the basis of sex, transgender status, or gender identity must be found unconstitutional "unless [it is] substantially related to a sufficiently important governmental interest."  *Grimm*, 972 F.3d at 608 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985)).  "To survive intermediate scrutiny, the state must provide an 'exceedingly persuasive justification' for its classification."  *Id.* (citation omitted).  The alleged results and motivations of the Policies as outlined above are more than sufficient

"to establish that the principal purpose and the necessary effect of this law are to demean those persons who" identify as transgender and LGBTQ. *United States v. Windsor*, 570 U.S. 744, 774 (2013). In short, Plaintiffs allegations suggest that Defendants' implementation of the Written and Unwritten Policies was not substantially related to a sufficiently important governmental interest. However, the Court notes that even if the more deferential standard of rational basis were to apply, Plaintiffs have still alleged sufficient facts to proceed with their claims at this stage in litigation.[5] Based on Plaintiffs' allegations, Defendants did not have a rational basis for their alleged discriminatory conduct, because, as discussed above, the Written Policies took the constitutionally protected decisions on how to raise children away from parents instead of merely supporting it and no basis has been provided for the implementation of the Unwritten Policy. Accordingly, Defendants' Motion to Dismiss is denied as to Plaintiffs' equal protection claims.

3. Qualified Immunity

Defendants argue that Defendants James and Allen are entitled to qualified immunity to the extent that Plaintiffs seek civil liability or an award of monetary damages against them. *See* ECF No. 20 at 42. Plaintiffs contend that Defendants' assertion of qualified immunity is immaterial because qualified immunity does not apply to claims for prospective relief, which is the only kind of relief Plaintiffs seek in this action. ECF No. 27 at 38. In their Reply, Defendants do not address whether qualified immunity applies to

---

[5] The Court applies rational-basis review when a government imposed a regulation does not involve a suspect class and will uphold the law if it rationally relates to a legitimate government objective. *Cleburne*, 473 U.S. at 440.

34

6:25-cv-02599-DCC    Date Filed 03/19/26    Entry Number 44    Page 35 of 35

Plaintiffs' requested relief, and it appears they have abandoned their qualified immunity arguments.  *See* ECF No. 33.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  However, "qualified immunity does not apply against . . . prospective relief."  *Henderson v. Harmon*, 102 F.4th 242, 251 n.6 (4th Cir. 2024) (citation omitted).  Qualified immunity also does not prevent an award of attorneys' fees pursuant to 42 U.S.C. § 1988 against public officials acting in their official capacity.  *See Pulliam v. Allen,* 466 U.S. 522, 543–44 (1984).  Here, Plaintiffs' requested relief is prospective, and Defendants' qualified immunity defense is accordingly inapplicable.  ECF No. 5 at 36–37.[6]

### IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss [20] is **GRANTED IN PART** and **DENIED IN PART** as set out above.

IT IS SO ORDERED.

<u>s/ Donald C. Coggins, Jr.</u>
United States District Judge

March 19, 2025
Spartanburg, South Carolina

---

[6] Defendants also raise the merits of Plaintiffs' request for class certification.  *See* ECF No. 20 at 43–44.  As Defendants recognize, however, Plaintiffs' class allegations and request for class certification are not yet before the Court.  *See id*.  Accordingly, the Court declines to address the merits of Plaintiffs' class certification allegations at this time.

35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| O.R., by and through his parents, Cheryl Rogers and Greg Rogers, on behalf of himself and those similarly situated; | ) ) ) ) | No. 6:25-cv-02599-DCC |
| CHERYL ROGERS; | ) ) | |
| GREG ROGERS; | ) ) | |
| E.G., by and through her mother, Amber Galea, on behalf of herself and those similarly situated; | ) ) ) ) | |
| M.G., by and through her mother, Amber Galea; and | ) ) ) ) | |
| W.M., by and through his mother, Kersey Clark, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **ORDER** |
| GREENVILLE COUNTY, SOUTH CAROLINA; | ) ) ) | |
| BEVERLY JAMES, in her official capacity as Executive Director of the Greenville County Library System; | ) ) ) ) ) | |
| KAREN ALLEN, in her official capacity as Youth Services Manager of the Greenville County Library System, and | ) ) ) ) ) | |
| GREENVILLE COUNTY LIBRARY SYSTEM, | ) ) ) | |
| Defendants. | ) ) | |

This matter is before the Court on Defendants Beverly James, Karen Allen, and

Greenville County Library System's (the "Library") (collectively, the "Library Defendants") Motion to Certify for Interlocutory Appeal or, Alternatively, to Reconsider or Stay and Defendant Greenville County's (the "County") Motion for Reconsideration and/or Clarification.  ECF Nos. 47, 48.  For the reasons set forth below, the Library Defendants' Motion is granted as to the primary relief sought and denied as moot as to the alternative relief sought, and the County's Motion is granted.

## II.  APPLICABLE LAW

### A.  Certificate of Appeal under 28 U.S.C. § 1292

"[28 U.S.C. §] 1292(b) provides a mechanism by which litigants can bring an immediate appeal of a non-final order upon the consent of both the district court and the court of appeals."  *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 623 (D. Md. 2013) (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982)).  Pursuant to 28 U.S.C. § 1292(b), an interlocutory appeal may be sought for an order that is not otherwise appealable when the district court is "of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  As such, a district court may certify an order for interlocutory appeal when: "1) such order involves a controlling question of law, 2) as to which there is substantial ground for difference of opinion, and 3) an immediate appeal from that order may materially advance the ultimate termination of the litigation."  *Mun. Ass'n of S.C. v. Serv. Ins. Co., Inc.*, 2011 WL 13253448, at *3 (D.S.C. Sept. 21, 2011) (internal quotations omitted).  All three requirements must be met.  *Id.*

**B. Reconsideration under Rule 54**

Any order "that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). The Fourth Circuit has held that that motions under Rule 54(b) are "not subject to the strict standards applicable to motions for reconsideration of a final judgment." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003); *see also Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1472 (4th Cir. 1991) (finding it "unnecessary to thoroughly express [Fourth Circuit's] views on the interplay of Rules 60, 59, and Rule 54"). In deciding these motions, district courts have looked to the standards of motions under Rule 59 for guidance. *Sanders v. Lowe's Home Ctrs, LLC*, C.A. No. 0:15-cv-02313-JMC, 2016 WL 5920840, at *2 (D.S.C. Oct. 11, 2016). "Therefore, reconsideration under Rule 54(b) is appropriate on the following grounds: (1) to account for an intervening change in controlling law; (2) to account for newly discovered evidence; or (3) to correct a clear error of law or prevent manifest injustice."[1] *South Carolina v. United States*, 232 F. Supp. 3d 785, 793 (D.S.C. 2017).

---

[1] Courts in this district have recognized that:

> The Fourth Circuit has suggested that the law of the case doctrine has evolved as a means of guiding a district court's discretion in deciding a Rule 54(b) motion for reconsideration of an interlocutory order. *Am. Canoe Ass'n*, 326 F.3d at 515. Under the law of the case doctrine, an earlier decision of the court becomes the law of the case and must be followed unless "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *Sejman v. Warner–Lambert Co., Inc.,* 845 F.2d 66, 69 (4th Cir.

3

A motion to reconsider an interlocutory order is not an appropriate vehicle to rehash arguments already considered by the court because the movant is displeased with the outcome. *See Ashmore v. Williams*, 8:15-cv-03633-JMC, 2017 WL 24255, at *3; *Sanders v. Wal-Mart Stores E.*, No. 1:14-cv-03509-JMC, 2016 WL 6068021, at *3 (D.S.C. Oct. 17, 2016). Nor may a movant raise new arguments or evidence that could have been raised previously. *See Nationwide Mut. Fire Ins. Co. v. Superior Solution, LLC*, No. 2:16-cv-423-PMD, 2016 WL 6648705, at *2 (D.S.C. Nov. 10, 2016); *Regan v. City of Charleston*, 40 F.Supp.3d 698, 701 (D.S.C. 2014). In assessing a motion under Rule 54(b), these standards are not as strictly applied as they would be if the order were a final judgment and reconsideration were sought under Rule 59(e). *Am. Canoe Ass'n*, 326 F.3d at 514–15.

## III. BACKGROUND

This action arises out of dispute over the constitutionality of policies implemented by the Library Defendants. *See* ECF No. 5. On June 27, 2025, the Library Defendants filed a Motion to Dismiss Plaintiffs' Amended Complaint. ECF No. 20. On March 19,

---

1988) (internal quotation marks omitted), *cited with approval in Am. Canoe Ass'n*, 326 F.3d at 515. This court notes that the three reasons for overcoming the law of the case doctrine mirror the three reasons for granting relief under Rule 59(e). *See United States v. Duke Energy Corp.*, No. 1:00cv1262, 2014 WL 4659479, at *3 n.4 (M.D.N.C. Sept. 17, 2014).

*South Carolina v. United States*, 232 F. Supp 3d at 793. The Fourth Circuit has clarified that "[t]his standard closely resembles the standard applicable to motions to reconsider final orders pursuant to Rule 59(e), but it departs from such standard by accounting for potentially different evidence discovered during litigation as opposed to the discovery of new evidence not available at trial." *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (internal quotation marks and citation omitted).

2026, the Court granted in part and denied in part the Library Defendants' Motion. ECF No. 44. On April 8, 2026, the Library Defendants filed their Motion to Certify for Interlocutory Appeal or, Alternatively, to Reconsider or Stay. ECF No. 47. The Library Defendants represent that there was no opposition by Plaintiffs or the County as to their requested primary relief—a certificate of appealability. *See id.* at 1, 4 n.2. No response in opposition was filed within the time to do so.[2] On April 16, 2026, the County filed its Motion for Reconsideration and/or Clarification or Amendment of Court Order. ECF No. 48. No response in opposition was filed.

### III. DISCUSSION

**A. The Library Defendants' Motion for Certificate of Appealability**

The Library Defendants ask the Court for an Order certifying the March 19, 2026, Order, which denied the Library Defendant's Motion to Dismiss in part. *See* ECF Nos. 47, 44. The Library Defendants specifically assert that they wish to appeal the Court's findings on Plaintiffs' First Amendment claims,[3] and they contend that they have

---

[2] In the Library Defendants' Motion, they represent that Plaintiffs were consulted as to all relief that the Library Defendants request and that Plaintiffs "do not object to the Court certifying its order to allow Defendants to pursue interlocutory review," but they "object to all other relief [that the Library] Defendants seek." ECF No. 47 at 4 n.2. On May 13, 2026, Plaintiffs filed a Motion for Leave to File Out of Time a response in opposition to the Library Defendants' Motion to the extent it seeks alternative relief in the form of reconsideration or a stay. *See* ECF No. 49. Since the Court ultimately grants the unopposed, primary relief sought by the Library Defendants, the Court need not reach the requested alternative relief for reconsideration or to stay raised by the Library Defendants. Accordingly, Plaintiffs Motion for Leave to File Out of Time, ECF No. 49, is denied as moot.

[3] The Library Defendants refer to the Court's ruling on Plaintiffs' First Amendment claims. The Court notes that one of Plaintiffs' two First Amendment claims was dismissed for lack of standing. ECF No. 44 at 13–15. The Library Defendants do not discuss the

5

demonstrated all three elements are applicable and met for these claims. ECF No. 47 at 8–14.[4]   Neither Plaintiffs nor the County oppose Defendants' Motion to Certify for Interlocutory Appeal.  *See* ECF Nos. 47 at 1, 4 n.2; 49 at 1, 2 n.1.

In denying the Library Defendants' Motion to Dismiss Plaintiffs' First Amendment claims, the Court considered "whether a public library may, without violating the First Amendment, enforce a policy that results in moving books based on their content to a separate, more restrictive section of the library." ECF 44 at 23.  Neither the Fourth Circuit nor the Supreme Court has directly addressed this issue, so the Court turned to the Supreme Court's plurality decision in *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982), as well as other courts' interpretations of that decision, for guidance.  *See id.* at 23–28.  Because, based on Plaintiffs' allegations, "there is a plausible inference that the decision to enact the Written Policies[5] was based on

_____

Court's ruling on this First Amendment claim in their Motion, and, instead, focus their argument for certificate of appeal solely on the Court's ruling on Plaintiffs' other First Amendment claim.  *See* ECF No. 47.  Accordingly, the Court's analysis is limited to the relief that the Library Defendants specifically seek in their Motion.

[4] The Library Defendants also move for reconsideration or to stay.  *See* ECF No. 47.  While their request for relief related to the reconsideration or to stay address the Plaintiffs' Equal Protection claims, which the Court also declined to dismiss, it appears to the Court that the Library Defendants only seek a certificate of appealability as to the Court's ruling on one of Plaintiffs' First Amendment claims.  *See id.*  Accordingly, the Court's analysis is limited to the relief that the Library Defendants specifically seek in their Motion.

[5] "Written Policies" was defined in the Court's prior Order as the two written policies implemented by the Library in 2024, which removed all material from the juvenile and young adult sections of the library that contain "illustrations, themes, or story lines [that] affirm, portray, or discuss changing the appearance of a minor's gender in ways inconsistent with the minor's biological sex" or with "illustrations, themes, or storylines that celebrate, portray, or affirm gender transitioning."  ECF No. 44 at 3 (citations omitted).

Defendants' ideological objections to the books' content or disagreement with their messages or themes rather than a viewpoint neutral reason," the Court denied the Library Defendants' Motion to Dismiss. *Id.* at 28. As noted by the Court, "drawing all inferences in Plaintiffs' favor, that Defendants' alleged conduct would not survive under any level of scrutiny," but the Court did not determine at this stage of litigation what level of scrutiny would apply to these claims. *Id.* at 28 n.4. Further, the Court declined to find that the government speech doctrine extended to library curation at the motion-to-dismiss stage based on the presence of contradictory persuasive precedent, the readily distinguishable factual background in the controlling precedent, the Supreme Court's directive to apply caution in extending the government speech doctrine, and the procedural posture of this action. *Id.* at 20–23.

The Library Defendants assert that "[c]ertification of the Court's Order of March 19, 2026, is warranted because it satisfies the statutory criteria and because it involves important, novel questions that are arising with increasing frequency." ECF No. 47 at 8. For the following reasons, the Court determines that certification is proper under 28 U.S.C. § 1292(b).

First, the Library Defendants assert that Plaintiffs' First Amendment claims raise central questions of law that are novel to this Circuit, including whether individuals have a positive right to receive information from a public library under the First Amendment and whether a public library's collection decisions are government speech. ECF No. 47 at 9. The Court finds that, based on these proposed questions, the Library Defendants seek to raise controlling questions of law on appeal that would be dispositive of the litigation. *See*

7

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 6:15-MN-2613-BHH, 2016 WL 7320864, at *5 (D.S.C. July 18, 2016) ("A controlling question of law is a narrow question of pure law whose resolution would be completely dispositive of the litigation, either as a legal or practical matter." (quoting *Michelin N. Am., Inc. v. Inter City Tire & Auto Ctr., Inc.*, 6:13-1067-HMH, 2013 WL 5946109, at *3 (D.S.C. Nov. 6, 2013))).  The resolution of either of these questions would materially impact the outcome of this litigation and, indeed, resolution in the Library Defendants' favor could completely resolve this action. Further, the particular facts of this dispute need not be addressed in order to resolve these questions.  *See Randolph v. ADT Sec. Servs., Inc.*, No. CIV.A. DKC 09-1790, 2012 WL 273722, at *5 (D. Md. Jan. 30, 2012) ("Even where the question presented is a legal one, if resolution of that issue is rooted in the facts of a particular case, the question is not proper for interlocutory review." (citing *Fannin v. CSX Transp., Inc.,* 873 F.2d 1438, at *5 (4th Cir.1989) (unpublished opinion))).  Thus, the Court finds that its prior Order involves a controlling question of law.

Second, the Library Defendants contend that the novel theories of law described above are untested both in this district and the Fourth Circuit and that First Amendment jurisprudence in the library context has long been disputed and remains unsettled, as demonstrated by the Supreme Court's decision in *Pico*, 457 U.S. 853.  ECF No. 47 at 11. According to the Library Defendants, other courts who have addressed the issue have produced mixed results.  *Id.*  Based on case law as it currently stands, the Library Defendants contend there are substantial grounds for differences of opinion as the law in this area is unclear.  *Id.* at 12–13.  The Court agrees that the questions presented in this

litigation are novel and unsettled and there are substantial grounds for disagreement, which support a certificate of appeal on these issues. *See, e.g.*, *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010) (finding substantial grounds supporting a certificate of appealability "where the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented"); *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009) (explaining that "district courts should not hesitate to certify an interlocutory appeal" under § 1292(b) when a decision "involves a new legal question or is of special consequence"); *but see In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996) ("[M]ere presence of a disputed issue that is a question of first impression, standing alone, is insufficient." (citations omitted)).

Third, the Library Defendants argue that immediate appeal of the Court's Order would materially advance the ultimate termination of the litigation in this action given the novelty of the legal questions at issue. ECF No. 47 at 13–14. The Library Defendants further contend similar questions of law have recently been raised and dealt with differently among the circuits, meaning that there is potential that, after expending significant funds to litigate this matter, there could be a dispositive ruling by either the Fourth Circuit or the Supreme Court that would materially impact this case. *Id.* at 13. Under the third prong, certification of an interlocutory appeal is appropriate only "in exceptional situations in which doing so would avoid protracted and expensive litigation." *Fannin*, 1989 WL 42583, at *2 (quoting *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982)); *see Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir.

2011) (holding that an interlocutory appeal would materially advance resolution of litigation where reversal by the appellate court would dismiss one defendant and resolve multiple claims against all defendants, even though it would not resolve the entire case). As noted above, dependent on the resolution of these legal questions, some or all of the pending litigation may be concluded based upon the Fourth Circuit's ruling in this matter. Further, the Library Defendants have presented compelling, and unopposed, arguments that such a ruling would potentially save the Parties significant costs in litigating the matter. Thus, the Court finds that immediate appeal of the issues raised by the Library Defendants may materially advance the ultimate termination of the litigation.

For these reasons, the Court finds that its March 19, 2026, Order should be certified for immediate, interlocutory appeal on the issues described herein and set out in the Library Defendants' Motion. *See* ECF No. 47 at 8–14. Accordingly, the Library Defendants' Motion is granted as to the primary relief request—a certificate of appealability—and denied as moot as to the alternative relief sought—reconsideration or to stay.

**B. The County's Motion for Reconsideration or Clarification**

The County moves pursuant to Federal Rule of Civil Procedure 54(b) for "reconsideration or more specifically clarification or amendment of the Court's Order filed March 19, 2026," and specifically seeks clarification by the Court that the Library is still a party to this action and that the County has not filed any dispositive motions and did not join the Motion to Dismiss filed by the Library Defendants. ECF No. 48 at 1–2. Neither Plaintiffs nor the Library Defendants filed a response to the County's Motion.

Plaintiff seeks relief under Fed. R. Civ. P. 54(b), which empowers this Court to revise any order at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.  As noted above, under Rule 54(b), reconsideration "is appropriate on the following grounds: (1) to follow an intervening change in controlling law; (2) on account of new evidence; or (3) to correct a clear error of law or prevent manifest injustice." *Ashmore v. Williams*, No. 8:15-cv-03633, 2017 WL 24255, at *2 (D.S.C. Jan. 3, 2017).  This revisory power is committed to the discretion of the court, with the goal being "to reach the correct judgment." *Cohens v. Md. Dept. of Human Resources*, 933 F.Supp.2d 735, 741 (D. Md. 2013) (quoting *Netscape Commc'ns Corp. v. ValueClick, Inc.*, 704 F. Supp.2d 544, 547 (E.D. Va. 2010)); *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003).  Some courts have relied on the authority of Rule 54 to clarify prior Orders.  *See, e.g.*, *Thompson v. Garnett*, No. CV 18-1022, 2020 WL 7351953 (D. Md. Dec. 15, 2020).[6]

The Court finds that clarification is appropriate to correct any inadvertent confusion caused by omissions or clerical errors in the Court's prior Order.  Therefore, the Court clarifies that the Library is still party to this action and that the County was not party to the Motion to Dismiss filed by the Library Defendants.  Accordingly, the County's Motion is granted to the extent it seeks clarification of the Court's prior Order.

---

[6] Further, under Federal Rule of Civil Procedure 60(a), "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice."  While relief may be granted under Rule 54(b), the Court finds that Rule 60(a) is another appropriate means for the relief that the County seeks.

11

## IV. CONCLUSION

For the reasons set forth above, the Library Defendants' Motion to Certify for Interlocutory Appeal [47] is **GRANTED** as to the primary requested relief and **DENIED AS MOOT** as to the alternative relief sought.  Further, the County's Motion for Reconsideration or Clarification [48] is **GRANTED** as set forth herein.

IT IS SO ORDERED.

s/ Donald C. Coggins, Jr.
United States District Judge

May 28, 2026
Spartanburg, South Carolina